MRS. GENTRY HANCOCK *et al. v.* OSCAR HORNE *et al.*

(*Nashville.*   December Term, 1915.)

TRUSTS.   Constructive trust.   Fraud.   Family transaction.

Defendant, a resident and the owner of five-sevenths of a tract
of 443 acres in which complainants, his nonresident sisters,
each owned a one-seventh interest, who entered into a writ-
ten contract with them to have a sealed appraisal made, with
the right to purchase at the appraised price or at any higher
bid, which contract was not legally binding upon complain-
ants, who were both married women, and who in response to
their inquiry stated that he had no faith in any prospects of
phosphate on the land, and that there had been no offer to lease
it since one made years ago, and who later, and before the com-
plainants' deeds were sent him, knew of the discovery of phos-
phate and was pressed for options, but who failed to inform
complainants of the discovery or the applications for leases and
options, and who purchased it on its valuation as farming land
for $16,000 or $17, 000, and who later sold 252 acres for $40,-
000 pursuant to an option contract made within a day or two
of receiving the deeds, was guilty of a breach of duty in
withholding information of facts going to increase its value,
and of a breach of a confidential relation or trust, notwith-
standing the contract, and would be declared a trustee for
each of the complainants for one-seventh of the proceeds of
the sale.

Cases cited and approved:  Smith v. Countryman, 30 N. Y., 655;
Shaeffer v. Sleade, 7 Blackf. (Ind.), 178; Stebbins v. Eddy, 4
Mason, 417; Cullen v. Hernz, 13 N. Y. St. Rep., 334; Mont-
gomery Southern R. Co. v. Matthews, 77 Ala., 357; Perkins
v. McGavock, 3 Tenn., 415; White v. Flora, 2 Tenn., 426; Harris
v. Williamson, 5 Tenn., 124; Walker v. Dunlop, 6 Tenn., 271;
Lewis v. McLemore, 18 Tenn., 206; Phillips v. Hollister, 42

Hancock v. Horne.

Tenn., 269; Coffee v. Ruffin, 44 Tenn., 487; Keith v. Kellam (C. C.), 35 Fed., 243.

FROM GILES.

Appeal from the Chancery Court of Giles County.— WALTER S. BEARDEN, Chancellor.

J. D. WOODWARD, for appellants.

E. E. ESLICK, for appellees.

MR. CHIEF JUSTICE NEIL delivered the opinion of the Court.

The complainants, Mrs. Hancock and Mrs. Wood, and the defendant Oscar Horne, were the owners of four hundred and forty-three acres of land lying in Giles county, this State. The two complainants, sisters of the defendant, owned each a one-seventh undivided interest, and the defendant owned the remaining five-sevenths, one-seventh by inheritance, and the residue by purchase from other coheirs. At the death of their mother these parties, complainants and defendant, desired to sell the land for the purpose of dividing the proceeds. The two complainants lived out West; Mrs. Hancock in Oklahoma, and Mrs. Wood, a part of the time in Colorado, and afterwards in New Mexico and Idaho. The complainants had been absent

many years, and had made only one return trip home, and that was several years before the transaction occurred which is the subject of the present controversy. During the year 1909 they began to actively discuss the subject of sale. Mrs. Hancock, with whom concurred Mrs. Wood, desired a sale at public auction, but the defendant opposed this. His reason, as stated in his deposition, was that he desired to become the purchaser, and feared that he might be accused of bribing the officer who might make the sale. A long correspondence ensued, covering quite a year. It was finally agreed between the parties that three neighbors should be selected who would file sealed appraisals separately with one of the banks of Pulaski on the 15th of June, 1910; also that advertisement should be made notifying the public that sealed bids would be entertained up to the date mentioned, each bidder being required to deposit $500 with his bid. It was also agreed that defendant should become the purchaser at the appraisal price in the event no higher bid should be shown by any of the sealed bids, and in the event of such higher bid then the defendant was to have the right to take the land at such higher bid. These matters were all made the subject of a written contract between the parties, but this contract could not, of course, be legally binding upon the two complainants, because they were both married women, and under our law as it then stood they could not alienate their land except by deeds with privy examination. There was also at the same time a paper signed authorizing

defendant to spend as much as $1,000 to put the place in a condition for sale.

The advertisement was made as agreed, but no private bids were offered. However, the parties selected filed their price appraisals, which showed an average valuation of $35.83 1/3 per acre. The bank at once notified the complainants of the result, and the defendant likewise shortly afterwards wrote the complainants a letter in which he said that he would take the land at the appraised price. There was some delay for the purpose of making a survey to ascertain the exact acreage, but this was finally abandoned, and the deeds were executed in due form and sent by the complainants, Mrs. Hancock in March, 1911, and Mrs. Wood in April of the same year. Just about the time the defendant received the last deed he gave an option to Ragsdale & Co., reciting, in substance, that phosphate in paying quantities had been discovered upon the land, and in September of the same year he closed out his transaction with the parties last named by which he sold two hundred and fifty-two acres of the land for $40,000, $15,000 cash, and notes for $25,000. He has not collected these notes, but they are in suit in the chancery court of Giles county, under a bill to foreclose the lien retained for their security.

At this point it is necessary to go back to January, 1910, which was in the midst of the letter writing and negotiation between the parties. Mrs. Hancock wrote the defendant that she believed there was phosphate upon the land, and asked her brother to investigate it

before the sale should be made. She stated that according to her recollection there had been several applications prior to 1910 to lease the property for phosphate purposes. In reply to this letter the defendant wrote:

"Right here I wish to say that I have no faith in the prospects of phosphate in paying quantities on this place. Gentry, you must be laboring under the wrong impression about this place wanting to be leased for years. About fifteen or eighteen years ago, when the excitement got so high in Maury county, John Fry was wanting to lease this place along with all the lands, or any of the lands, in Giles county. He wanted to lease this place for a span of twenty years, and that is the only application that has been made to lease it. He did not want to pay anything for the lease, except if they found rock in paying quantities, to give a part of it to the landholders."

On receiving this letter, Mrs. Hancock, relying wholly on her brother, abandoned all concern about the phosphate, and her sister, Mrs. Wood, was governed by Mrs. Hancock's views about all these matters. The defendant was fully informed by the letters from his sisters of the trust and confidence which they reposed in him, and he never disclaimed that trust, or gave them to understand that he was dealing with them at arm's length, further than that he desired that they should each select an appraiser without influence on his part. He objected, however, to their writing letters back into the neighborhood making in-

quiries about the value of the land. The reason given was, however, that one of the sisters had written to Mr. Green, the appraiser they had selected, and it was said that this might disqualify him from acting under the terms of the appraisal agreement.

It should be stated that when defendant wrote the letter of January 1, 1910, a part of which has just been reproduced, there had been, so far as this record shows, no inquiries as to phosphate on the land since the date of Mr. Fry's application for a lease mentioned in that letter. However, in the fall of 1910 phosphate was discovered on the land of E. Johnston adjoining the land owned by the parties to this litigation; likewise the same mineral was discovered in paying quantities on several farms lying near by. These facts produced considerable excitement in that neighborhood. The discovery of phosphate upon Mr. Johnston's land immediately turned the attention of prospectors to the Horne lands. During the fall of 1910 and spring of 1911 several persons applied to the defendant for options on the land with a view to prospecting for phosphate, but he declined them all. These persons were Ragsdale & Dailey, Jenkins, Lord & Elledge, and Garrett. Lord was so insistent that he grew angry at defendant's refusal, and threatened to carry the matter to his sisters. Defendant told him that it would do no good, as he had already bought the land. Garrett was so urgent that he finally asked leave to prospect the land at his own expense, without any option, and made quite a good many pits or holes,

Hancock v. Horne.

some of which showed nothing, but others of which showed a large phosphate vein, at one place fifteen feet in depth. The defendant affected to have no faith in these developments, and was rarely around the place where the experiments were being made, but Mrs. Horne, the wife of the defendant, followed the matter closely, and testified that they were greatly encouraged, and we have no doubt that the defendant was fully informed of the extent of the discoveries made by Garrett.

Now the defendant failed to inform his sisters of the activities in phosphate that had grown up between the appraisal of June 10, 1910, and the date of their deeds in March and April, 1911. He also failed to inform them of the various applications for leases and options made during this interval, and permitted them to make their deeds relying on his statement made on January 1, 1910, in his letter which we have quoted, and in absolute ignorance of the activities mentioned.

It should be stated that the defendant purchased the land without any valuation of the phosphate whatever, but simply on its valuation as farming land at the price per acre previously mentioned, which aggregated something like $16,000 or $17,000. As stated subsequently, he sold in September, 1911, two hundred and fifty-two acres for $40,000, carrying out the option contract which he made within a day or two of receiving the deeds from his sisters.

134 Tenn. 8

On these facts the complainants have brought their bill, praying in the alternative for a rescission, or that the defendant be held their trustee to the extent of their interest in the $40,000.

A rescission cannot be granted because the part of the land mentioned has been sold to an innocent purchaser, but the defendant can be declared a trustee as prayed. We think it is clear, under the facts stated, that the defendant practiced a fraud upon his sisters. He well remembered that inquiry had been made of him as to the existence of phosphate, and that he had made an answer which had completely silenced all further inquiries on that subject. While this answer was true at the time, the fact which it purported to represent was displaced by the subsequent developments mentioned, and it was the defendant's duty to inform his sisters of these developments. He cannot escape this conclusion by his statement that he did not really know whether there was any phosphate in paying quantities on the land, and that he does not even now know that there is a grade of phosphate that will pay for working, since the persons to whom he has sold have not yet developed the field. He knew that his sisters had inquired of him as to offers of leases and options; that he had informed them that there had been no such application since the one made by Mr. Fry eighteen years before. He well knew that, if he should inform them of the great activity that had arisen between June, 1910, and March, 1911, it would make them dissatisfied with the price which had been

fixed by the appraisers. It was his duty to inform them and permit them to decide for themselves whether they would let the land go at the price named in view of the prospects disclosed as stated. He could not justly say that he himself had no faith in these indications, and therefore he would not inform his sisters. They had a right to judge for themselves.

It is insisted for the defendant, however, that he had already purchased the land under the appraisal contract, which purported to mature on June 15, 1910, that the land was thenceforward his, and that his sisters were not concerned with future developments. This is a mistaken view. He well knew that this contract was not legally binding on his sisters; that they could act in protection of their rights in absolute disregard of it. In fact, as between them, for the purposes of this transaction, it must be treated as if the whole matter were verbal, culminating in the deeds of March and April, 1911. So treating it, there can be no doubt that an intending purchaser making similar representations to a distant vendor relying on him for the truth as to the value of the land or its contents would have devolved on him the duty of informing such vendor of the new facts countervailing the former representation. How much greater would this duty be when the vendors dealing with him were his sisters, residing in distant States, who had informed him by letters how wholly they trusted him and relied on him!

It is insisted on behalf of the defendant that, the reliance by the complainants upon the voidability of their deeds being a mere technical claim, although one sound in law, the defendant should not be onerated with the duty of making disclosures to them of matters that occurred in the interim, because it is really a breach of moral obligation on their part, an inequitable thing in fact, for them to depart from the appraisal agreement entered into in 1910. We do not think this is a correct view. Even if the complainants had discovered no new facts, it would have been in their power, at any time before the deeds were made, to withdraw from the supposed contract of 1910, since under our law it was absolutely within their discretion. It cannot be that this writing of 1910 would debar them from raising the equity that accrued to them by reason of the fraud practiced on them under cover of the trust reposed by them in their brother. The controversy between them and their brother would be simply whether he had violated such trust and procured their deeds through suppression of facts which he should have communicated to them. He cannot bring up in opposition to this relief the fact that they had signed papers which were not really binding on them.

It is insisted in behalf of the defendant that his agency was ended when the appraisal contract became consummate by the filing of the appraisals in June, 1910, in the bank at Pulaski, by the notification made by the cashier to the complainants immediately there-

after, and by the defendant's letters to them stating that he would take the land at the price fixed by the appraisers. The case does not turn upon the law of agency, but upon the ground that there was a relation of trust and confidence existing between the parties arising out of the fact that they were so closely bound by ties of blood, together with the express notice to defendant that they, as his sisters, trusted him, and were relying upon him to deal truly and fairly with them, and that they believed that he would do everything rightly. He accepted these protestations of confidence, trust, and affection, and permitted his sisters to remain in that state of mind. This could not be dissolved in the manner indicated. The defendant remained clothed with the duty thus devolved until the very end of the transaction. That end was inequitably produced, as we have just held. It is the duty of the court of chancery to right the wrong inflicted.

In *Smith* v. *Countryman,* 30 N. Y., 655, it is held that a vendor of property may put upon the purchaser the responsibility of informing him correctly as to the market value, or any other fact known to him affecting the market price of the property, and, if the purchaser answers untruthfully, the purchase will be void by reason of fraud; that the purchaser is not bound to answer in such case, but, if he does, he is bound to speak the truth. Likewise it was held in *Shaeffer* v. *Sleade,* 7 Blackf. (Ind.), 178, that, if a person desires to purchase property the value of which is entirely within the knowledge of the owner, without means of knowl-

edge on the part of the intending purchaser except to
rely on the statements of the seller, a statement of the
value will be binding on the seller upon the ground
that, if one party to a contract places all his trust and
confidence in the other party, and acts upon his opin-
ion, any misrepresentation by the party confided in in
a material way by which an undue advantage is taken
of the other is a fraud against which equity will re-
lieve. In *Stebbins* v. *Eddy*, 4 Mason, 417 Fed. Cas.,
No. 13,342, it was held that the affirmation of belief
is an affirmation of fact, that is, the fact of belief; and,
if it is fraudulently made to mislead or cheat another,
to abuse his confidence, or to blind his judgement, it is
in law and morals just as reprehensible as if any oth-
er fact was affirmed for a like purpose. In *Cullen* v.
*Hernz*, 13 N. Y. St. Rep., 334, it was held that, while it
is true that a mere opinion expressed by one person to
another as to the value of property is not actionable,
although it proves to be mistaken, yet the law will not
exonerate the one making it if he resorts to that mode
of expression, knowing the opinion to be unfounded,
with the object of deceiving the person to whom it may
be expressed to his or her prejudice. In *Montgomery
Southern R. Co.* v. *Matthews*, 77 Ala., 357, 54 Am.
Rep., 60, it was held that, if an opinion is falsely ex-
pressed with intent to deceive, and does deceive, this
constitutes such an opinion or representation a false
statement of fact, and vitiates a contract thereby pro-
cured, unless the representation relates to a matter

equally open to both parties. In Elliott on Contracts, section 84, it is said:

"If the parties sustain a fiduciary relation, one to the other, expressions of opinion or prediction on the part of the dominant party may be ground for avoiding a contract induced thereby. Thus, representations as to value made by an agent to his principal, an attorney to his client, or where trust and confidence are in fact reposed, although there is no special relation of trust and confidence, are considered as representations of fact and may be relied on."

In Pomeroy's Equity Jurisprudence, section 888, it is said:

"Where an untrue statement is made, in the honest belief of its truth, so that it is the result of an innocent error, and the truth is afterwards discovered, by the person who has innocently made the incorrect representation, if he then suffers the other party to continue in error, and act on the belief that no mistake has been made, this, from the time of discovery, becomes in equity a fraudulent representation, even though it was not so originally."

Our own cases are in accord. *Perkins* v. *McGavock,* 3 Tenn. (Cooke), 415; *White* v. *Flora,* 2 Tenn. (2 Overt.), 426; *Harris* v. *Williamson,* 5 Tenn. (4 Tayw.), 124, 125; *Walker* v. *Dunlop,* 6 Tenn. (5 Hayw.), 271, 272, 9 Am. Dec., 787; *Lewis* v. *McLemore,* 18 Tenn. (10 Yerg.), 206; *Phillips* v. *Hollister,* 42 Tenn. (2 Cold.), 269; *Coffee* v. *Ruffin,* 44 Tenn. (4 Cold.), 487, 507, 517. The subject is quite fully discussed and il-

lustrated in the case of *Keith* v. *Kellam* (C. C.), 35 Fed., 243, in an opinion by Judge Brewer.

We are of the opinion that the decree of the learned chancellor is erroneous, and that it should be reversed, and that a decree should be entered here to the following effect: Let a decree be entered in favor of each of the complainants for one-seventh of the $15,000 cash received by the defendant in the sale made by him to Ragsdale & Co., less a credit as against each of the complainants for one-seventh of the value of the two-hundred and fifty-two acres at the rate of $35.83 1/3. On this sum interest will be allowed from the filing of the bill. The decree will also declare that the defendant holds the $25,000 in notes subject to a trust in favor of each of the complainants for an undivided one-seventh interest therein.

The defendant will pay all the costs of this cause, for which execution will issue.