

# The Attorney General

# of Texas

## Austin 11, Texas

WILL WILSON
ATTORNEY GENERAL

July 3, 1957

Honorable J. M. Falkner, Commissioner
Department of Banking
Austin 14, Texas

Opinion No. WW-159

Re: Would the plan by which
the trust company purchases
and owns at least 37% of the
capital stock of two or more
banks be in violation of Article
342-903, V.C.S., or the provi-
sions of Article XVI, Section
16 of the Constitution of the
State of Texas, even though no
officer or director of the parent
bank would be a member of the
Board of Directors of the banks
in which capital stock is pur-
chased? and related questions.

Dear Mr. Falkner:

Your letter of March 15, 1957, is quoted in part as follows:

"We request your opinion regarding the legality of certain
plans, summarized below, which have been proposed by a national
bank doing business in Texas.

"The bank (hereinafter called parent bank) has entered into
a trust agreement whereby the entire capital stock of another
corporation (hereinafter called trust company), chartered under
Article 1303b, V.C.S., is held in trust for the benefit of the share-
holders of the parent bank, with the interest in the trust company
being automatically transferred with the purchase or sale of the
shares of the parent bank. The capital stock of the company was
originally purchased by the parent bank with funds withdrawn
from the undivided profits of the parent bank, as authorized by
vote of the shareholders.

"Under one proposed plan the trust company will purchase
at least thirty-seven per cent (37%), or more if permissible,
of the capital stock of two or more banks.

"Under an alternative plan the trust company would own the entire capital stock of each of several '1303b corporations', each of which would in turn purchase and own at least thirty-seven per cent (37%), or more, of the capital stock of a bank.

"Under a second alternative plan, several '1303b corporations' would be chartered and each would purchase and own at least thirty-seven per cent (37%), or more, of the capital stock of a bank. The entire capital stock of each of the '1303b corporations' would be owned and held in trust by one or more individuals as trustees for the shareholders for the parent bank. Stock in either State or National banks could be purchased and held under any one of the trust arrangements.

"Under these plans, dividends declared by the various banks would be paid to the trust company or the individual trustees. Dividends declared by the trust company would then be distributed to the shareholders of the parent bank in a proportion which the number of shares of stock in the parent bank owned by each such shareholder--on the date of the declaration of the dividend--bears to the total number of shares of capital stock of the parent bank outstanding on such date. Of course, if several '1303b corporations' were used rather than only one holding company, then dividends declared by each bank would be paid to the '1303b corporation' which owned its stock. Dividends declared by each of the '1303b corporations' would be paid entirely to the trust company under the alternative plan or to the individual trustees under the second alternative plan; dividends of the trust company or the moneys held by the individual trustees would then be distributed to the shareholders of the parent bank in the above-mentioned ratio.

"In connection with these proposed plans we would appreciate answers to the following questions: (1) Would the plan by which the trust company purchases and owns at least thirty-seven per cent (37%) of the capital stock of two or more banks be in violation of Article 342-903, V.C.S., or the provisions of Article XVI, Section 16, of the Constitution of the State of Texas, even though no officer or director of the parent bank would be a member of the Board of Directors of the banks in which capital stock is purchased? (2) Would the plan whereby the trust company owns the entire capital stock of several corporations chartered under Article 1303b, V.C.S., each of which corporations in turn owns at least thirty-seven per cent (37%) of the capital stock of one bank, be in violation of Article

342-903, V.C.S., or the provisions of Article XVI, Section 16, of the Constitution of the State of Texas, even though no officer or director of the parent bank would be a member of the Board of Directors of the banks in which capital stock is held by the various corporations? (3) If, under the alternative plan, the trust company and each of several '1303b corporations' whose entire capital stock is owned by the trust company have one or more identical officers or directors, would such identity of officers or directors constitute such dominance or control by the parent bank as to violate the provisions of Article 342-903, V.C.S., or Article XVI, Section 16, of the Constitution of the State of Texas? (4) Would either the first plan or the two alternative plans described above be in violation of Title 126, Article 7426 et seq., V.C.S.?"

## BACKGROUND FACTS

Article XVI, Section 16, of the Constitution of Texas provides in part as follows:

"Sec. 16. The Legislature shall by general laws, authorize the incorporation of corporate bodies with banking and discounting privileges, and shall provide for a system of State supervision, regulation and control of such bodies which will adequately protect and secure the depositors and creditors thereof.

". . . Such body corporate shall not be authorized to engage in business at more than one place which shall be designated in its charter." (Emphasis throughout is supplied.)

A report from a study by the Attorney General of possible violations of Article XVI, Section 16, of the Constitution, and Article 342-903, V.C.S., and the Texas Anti-trust Laws of proposals involving an analogous fact situation was submitted to the State Banking Board under the date of August 18, 1952. We refer you to this for background material.

Since that report was published, and pursuant to a request by the then Attorney General and the State Banking Board (of which he was a member), certain National banks in Texas reduced their holdings in affiliated State bank stock, which was trusteed through holding arrangements, to 37.03 per cent of the total shares of each affiliate bank. The 37.03 per cent figure was arrived at by the following process: The mean arithmetic percentage of stock actually voted at regular meetings of the several State banks involved

over a period of several years was calculated. This figure was 94.06 per cent. This was halved, and a safety factor of ten per cent was further deducted to arrive at the figure of 37.03 per cent.

We need not here consider the question of whether the hypothetical situations embraced in your letter would violate the Texas Anti-trust Laws (Title 126, Article 7426 et seq., V.C.S.). This involves restraint of trade and a lessening of competition, factors which are not necessarily involved in a determination of whether a banking corporation is "doing business at more than one place".

A determination of whether one banking corporation is doing business at more than one place through its relationship to other banking corporations can be reduced to two major factors, which are (a) stock ownership, direct or indirect, constituting the power to influence, and (b) a resulting substantial flow of business between or among the corporations.

## ANALYSIS OF THE STOCK OWNERSHIP FACTOR

The percentage of stock required to influence a corporation depends on many factors, including such matters as (a) stock distribution among the shareholders, (b) the amount of stock voted by proxy, and by whom the proxies are held, and (c) outside business and personal relationships between the shareholders.

The ownership of more than 50 per cent of the stock would establish, as a matter of law, the power to influence. Whether ownership of less than 50 per cent of the stock would establish this power would depend on the alignment and distribution of other stock, proxies held and other factors.

By way of comparison, the Federal Government, under the Bank Holding Company Act, 12 U.S.C.A., Section 1841 et seq., ownership or control, direct or indirect, of 25 per cent of the voting stock of two or more banks automatically classifies the banks so held as subsidiaries, and defines the company holding such shares as a bank holding company. When a bank holding company desires to acquire additional corporate shares, it must comply with the Act if it purchases more than 5 per cent of such stock, this percentage being considered significant for purposes of influence. (U. S. Code Congressional Service and Administrative News, 84th Congress, 2nd Session 1956, at page 2489).

Compare also a recent decision of the United States Supreme Court in the DuPont case, United States v. E. I. DuPont Nemours & Company, 25 L.W. 4343, (June 3, 1957), where the ownership of 23 per cent of the stock of one

corporation by another was tacitly conceded by the parties and the Court to constitute a sufficient ownership of the stock of one corporation by another corporation to influence the business affairs of the corporation so held in determining a related question under Section 7 of the Clayton Act.

We attach no special significance to a stock ownership of 37.03 per cent. Where the ownership is less than 50 per cent, its use to influence the business decisions of the bank will depend upon its relationship to the other stock and other factors.

## ANALYSIS OF THE BUSINESS FLOW FACTOR

There are many opportunities for investment in our economic system. When a bank buys stock in another bank, the question arises: Was the acquisition made solely for investment purposes or was it made for the purpose of channelling business into the purchasing bank or its affiliates? If instead of acquiring the flow of business through superior service or other competitive factors, the business is in fact acquired by influence stemming from stock ownership, then this deployment of its capital allows a bank to do business at more than one place. An "invasion" of one bank's inner management sanctorium through stock purchases by another bank automatically disrupts an arms length relationship. This might ultimately result in injury to the State bank by the loss of its bargaining power in dealing with other banks and can be a violation of the Constitution. If an examination of the flow of business between the banks before and after the acquisition of stock reveals a significant increase in the flow of business to the purchasing bank or its affiliates, the purchasing bank is doing business at more than one place through the exercise of stock ownership.

## AN EXAMINATION OF ARTS. 1303b and 1524a, V.C.S.

A basic inquiry raised by your letter is: Are 1303b corporations authorized by law to accomplish the objectives proposed? Article 1303b provides:

"A private corporation may be formed for any one or more of the following purposes, without banking or insurance privileges; . . . to subscribe for, purchase, invest in, hold, own, assign, pledge, and otherwise deal in and dispose of shares of capital stocks, bonds, mortgages, debentures, notes and other securities or obligations, contracts and evidences of indebtedness of foreign or domestic corporations not competing with each other in the same line of business; . . . Provided that the power and authority herein con-

ferred shall in no way affect any of the provisions of the anti-trust laws of this State." Acts 1927, 40th Leg., p. 414, ch. 275, Sec. 1; Acts 1945, 49th Leg., p. 96, ch. 67, Sec. 1.

There are no court decisions construing this statute, but the plain meaning of the language "not competing with each other in the same line of business" would prohibit a 1303b corporation from holding the stock of more than one bank in the same general geographic location. Therefore, the holdings by a 1303b corporation of stock in two banks under the facts submitted would clearly be unauthorized by this statute.

In our opinion, with reference to your second alternative plan, the courts would not permit the device of several 1303b corporations, each owning separate stock in separate banks competing with each other in the same line of business to circumvent the plain intent of the statute. This legislative purpose is further expressed by the concluding proviso of Article 1303b, V.C.S.: "Provided that the power and authority herein conferred shall in no way affect any of the provisions of the anti-trust laws of this State." Courts will disregard matters of form and look to matters of substance on inquiring into alleged unlawful acts of affiliated, parent-subsidiary, interlocking ownership or other closely associated corporate arrangements when the subject of inquiry is the violation or circumvention of the law or of valid corporate regulations. State v. Swift and Co., 187 S.W.2d 127 (Tex.Civ.App. 1945, error ref.); First National Bank v. Gamble, 134 Tex. 112, 132 S.W. 100 (1939); Pacific American Gasoline Co. v. Miller, 76 S.W.2d 833 (Tex.Civ.App. 1934, error ref.); Goodwin v. Abilene State Bank, 294 S.W. 883 (Tex.Civ.App. 1927, error ref.).

Section 1 of Article 1524a, V.C.S., is quoted in part as follows:

"Article 1524a. Corporations for loaning money and dealing in bonds and securities without banking and discounting privileges; regulations.

"Section 1. This Act shall embrace corporations heretofore created and hereafter created having for their purpose or purposes any or all of the powers now authorized in Subdivisions 48, 49 or 50 of Article 1509, Revised Civil Statutes of Texas (1925), and heretofore or hereafter created having in whole or in part any purpose or purposes now authorized in Chapter 275, Senate Bill No. 232 of the General and Special Laws of the Regular Session of the 40th Legislature. No such corporation shall act as agent or trustee in the consolidation of or for the purpose of combining the assets, business or means of other persons,

> firms, associations or corporations, nor shall such corporation
> as agent or trustee carry on the business of another, . . ."

This statute providing for certain regulations of such corporations further evidences the legislative intent expressed in Article 1303b that is, that 1303b corporations shall not be used for combining assets of corporations "competing with each other in the same line of business".

"The principal rule that has been formulated for the interpretation of charter powers is that only such powers are given as are clearly embraced in the words of the act or charter or derived therefrom by necessary implication in view of the object of the grant. Another cardinal rule applying particularly to charters under which special privileges are claimed is that any ambiguity or doubt must be resolved in favor of the public as against the grantees of the charter." 10 Tex. Jur., Corporations, Sec. 243. See East Texas Electric Co. v. Woods, 230 S.W. 498, 503 (Tex.Civ.App. 1921, error diam.); Galveston Wharf Co. v. Gulf C. & S. F. Railway Co., 81 Tex. 494, 501, 17 S.W. 57 (1891); Victoria County v. Victoria Bridge Co., 68 Tex. 62, 4 S.W. 140 (1887).

Since your letter mentions a plan for chartering new "1303b corporations", it should be mentioned that a recent opinion of the Attorney General dated April 1, 1957, to the Honorable Zollie Steakley, Secretary of State, Opinion No. WW-77, has ruled that Article 1303b was repealed by the provisions of Article 9.16a et seq. of the Texas Business Corporation Act, and that no new 1303b corporations may be formed under said Act.

The foregoing discussion concerning Article 1303b and Article 1524a, V.C.S., with respect to the powers of such corporations, would therefore apply only to all presently existing corporations organized prior to the effective date of the Texas Business Corporation Act under Article 1303b, V.C.S.

### SUMMARY

No new "1303b" corporations may be chartered. Existing "1303b" corporations are without charter powers to legally participate in any of the hypothetical arrangements proposed by your letter. The ownership of 37 per cent of the stock of one banking corporation by another banking corporation may or may not present a violation of Article XVI, Section 16, of the Constitution

of Texas, and the statutes enacted pursuant thereto, depending upon the factors mentioned in the body of the opinion. We express no opinion as to whether the hypothetical situations embraced in your letter would violate the Texas Anti-trust Laws.

Very truly yours,

WILL WILSON
Attorney General of Texas

By

Houghton Brownlee, Jr.
Assistant

NB:tiw

APPROVED:

OPINION COMMITTEE:

H. Grady Chandler, Chairman

C. K. Richards

T. Lawrence Jones

James N. Ludlum

REVIEWED FOR THE ATTORNEY GENERAL
BY: Geo. P. Blackburn