McNEILL *v.* DOBSON-BAINBRIDGE REALTY CO., INC., *et al.*

(*Nashville*, December Term, 1945.)

Opinion filed June 29, 1946.

W. P. Cooper, of Nashville, for appellant.

J. C. Edwards, of Nashville, for appellee (complainant below).

MR. SPECIAL JUSTICE PRIDE TOMLINSON delivered the opinion of the Court.*

Mrs. Martha McNeill owned a residence in Davidson County and desired to make a quick sale thereof for cash. She was not compelled, however, to make a sale. She was offered Two Thousand Five Hundred ($2,500) Dollars cash for this residence. Dobson-Bainbridge Realty Company was engaged in the business as an agent or broker for the sale or renting and collection of rents, etc., of real estate. Mrs. McNeill properly regarded this company as being entirely reliable, and was acquainted with one of its officials, and having had very little business experience and being totally unfamiliar with the reasonable market value of real estate she desired to consult this company with reference to whether the price of Two Thousand, Five Hundred ($2,500) Dollars offered her was the reasonable value of the property; so she consulted with that official of the company with whom she was acquainted. He referred her to Mr. E. S. Morgan, Jr., one of the company's agents in its sales department. He promptly inspected the residence and reported to Mrs. McNeill that Two Thousand, Five Hundred ($2,500) Dollars was a fair price for it. In this conversation he suggested that if she would list the sale of this property with his company it might be that a sale would be procured which would net her a little more than the offer she had received after deducting the five (5%) percent commission of the company for making the sale. The arrangement between the company and its sales agent was to equally divide the commissions. Mrs. McNeill accordingly listed the property with this company for sale. In this conversation Mrs. McNeill informed Morgan that

*Sitting for Chief Justice Grafton Green.

she was carrying Three Thousand, Five Hundred ($3,500) Dollars insurance on the property and inquired as to whether it should not be reduced in view of his opinion of the value. He advised her to reduce it to Two Thousand Five Hundred ($2,500) Dollars, and she accordingly did so at once.

Five days thereafter (June 1, 1945) Morgan prepared a written offer to purchase this property for $2,650 cash. It was addressed to the Realty Company as her agent and executed by E. S. Morgan, Jr., Trustee. When Morgan presented this offer to Mrs. McNeill two days later for her acceptance Mrs. McNeill noticed that the purchase was by "Morgan Trustee" and she inquired "Well, who am I selling this too"? He replied, according to her testimony that "we" or according to his testimony "I" "have a trust fund for which we (or I as the case may be) invest money and it is with the trust funds that we (I) are buying it". As it subsequently turns out, this answer was deceptive and misleading. Two days later Mrs. McNeill executed her deed conveying her property to E. S. Morgan, Jr., Trustee, and received the sum of $2,-517.50, the Realty Company having deducted a five (5%) percent commission which was equally divided between it and Morgan. She was paid by the check of the Realty Company. Eight (8) days thereafter, Morgan, Trustee, executed a deed conveying this property to Mrs. Parsons for a consideration of $3,850, $850 of which was paid in cash and the balance by purchase money note of $1,800 due in five years and bearing interest at six (6%) percent per annum, and sixty (60) notes of $23.20 each, due one each month commencing the first month thereafter. The interest on these notes was calculated and incorporated as a part of the principal according to the amortization plan. These notes were secured by a first and second mortgage lien, respectively, on the real estate and Morgan

had the insurance on the residence increased to '$3,000. The small notes are being paid promptly as they fall due, each month, as is the interest of $9 per month on the large note. When the deed to Mrs. Parsons was filed for registration there was noted on the record the words ''do not publish''. It is not clear whether this was done at the instance of Mr. Morgan or Mrs. Parsons.

Mrs. McNeill in some way subsequently learned that a week after she had conveyed this property to Morgan, Trustee, he as such trustee, had sold it for a profit of approximately 46%. She promptly filed her bill seeking to have Morgan as her constructive trustee to account to her for the proceeds of this sale to Mrs. Parsons. Her bill also seeks recovery from the Realty Company as Morgan's principal and the surety on its bond.

The answer to this bill avers, and Morgan testifies, that he, Morgan, was in fact acting for his mother as the purchaser of this property; that his mother is a widow and had entrusted him with the handling and investment of her funds; that it was with money which she had in Bank that the purchase price of $2,650 was paid when the conveyance by Mrs. McNeill to Morgan, Trustee, was had and that the profit made in the sale to Mrs. Parsons was in fact a profit which went and was paid over to his mother, and that, therefore, neither he nor the Realty Company made any profit out of the transaction other than an equal division of another five (5%) percent commission. In support of this averment and insistence, and upon it being called for by cross-examination, Mr. Morgan exhibits a check executed by his mother under date of June 6 for the sum of $1,650. This check has written thereon ''For McNeill loan''. Mr. Morgan does not satisfactorily explain how the remaining $1,000 of the purchase price came from his mother to him for the payment of the pur-

chase price to Mrs. McNeill. There is no explanation as to why the check of Mrs. Morgan has written thereon the words "for McNeill loan" when in fact, according to her son, it was a purchase of the property by the mother and not a loan either to Mrs. McNeill, or to some one else for the purchase of her property. Nor is there any explanation by Mr. Morgan as to why he did not tell Mrs. McNeill that his mother was buying this property when she asked the direct question as to who was buying it. Morgan, of course, knew that his mother was the purchaser, assuming the accuracy of his testimony. His failure to disclose this fact to Mrs. McNeill in response to her direct inquiry and his giving instead what has turned out to be an evasive and misleading answer makes it necessary to conclude that Mr. Morgan intentionally withheld from Mrs. McNeill the fact that he, Morgan, was representing his own mother in this transaction in which he was acting as agent for Mrs. McNeill. There is also no satisfactory explanation of the fact that the mother, Mrs. Morgan, was not introduced as a witness by the defendants.

The chancellor held that there was no actual fraud, but that in as much as Morgan had acted as complainant's agent at the same time that he was acting as his mother's agent in a matter in which the two parties had adverse interests and had done this without disclosing that fact to Mrs. McNeill, he, Morgan, and his Realty Company should not have charged her a commission. The Chancellor accordingly entered a judgment against all the defenants for the amount of this commission, to-wit, $132.50. The court of appeals held that the presence of actual fraud was immaterial and that in as much as Morgan did not reveal the fact that he was representing his mother as buyer, while acting as agent for Mrs. McNeill, the seller, at the time he took this conveyance from her to himself

as trustee, he, therefore, took this conveyance as trustee for Mrs. McNeill and that when he again sold the property as such trustee he was bound to account to her for the proceeds of the sale without regard to the fact that his mother had made all the profit, except the commission.

This Court granted the petition of the original defendants for *certiorari,* and in a memorandum to counsel particularly invited that the oral argument be especially directed to the question of whether the original defendants are liable for this profit on the re-sale to Mrs. Parsons since that profit went to Mrs. Morgan rather than to the original defendants. This Court in this memorandum to counsel expressed itself as being doubtful as to whether the defendants should be held liable to account for the profits which went to the mother of Mr. Morgan. The case has been orally argued at this Bar.

■ An agent may with full knowledge of both principals represent the two principals having adverse interests. *Siler* v. *Perkins,* 126 Tenn. 380, 391, 149 S. W. 1060, 47 L. R. A. (N. S.) 232. In this case Morgan did advise Mrs. McNeill that he was investing trust funds and to that extent may fairly be said to have put her upon inquiry. However, "it is not enough for the agent to put the principal upon inquiry, but must disclose such material facts as are unknown to the principal and as will enable him to form a reasonably correct opinion and conclusion as to his best interest". *Raht* v. *Union Consol. Mining Co.,* 73 Tenn. 1, 21, 22.

■ ■ It may well be that Mr. Morgan intended no actual fraud. However, that does not alter the situation. The relation of principal and agent is a trust relation, Gibson Sec. 27; and it was the clear duty of Mr. Morgan to disclose to Mrs. McNeil the very pertinent fact that he, her agent as seller, was likewise acting as agent for his

own mother as buyer. Without so disclosing this fact to his *cestui que trust*, Mrs. McNeill, he procured from her this conveyance to himself as trustee. It must also be concluded that his failure to so disclose this fact was intentional, because his principal, Mrs. McNeill, pointedly asked him who was buying her property. In response, he gave a somewhat complicated statement as to the investment of unidentified funds which he said an unidentified party had placed in his hands for investment, instead of informing Mrs. McNeill, in response to her simple question, that he was representing his mother in this transaction.

Thus, Morgan, as agent while procuring from his principal a conveyance of her property to himself as trustee, and as a material part of the very act of so procuring, did intentionally commit a breach of duty owed to her as his principal with reference to the very property, with the selling of which she had entrusted him as her agent. In view of this fact, equity must construct this conveyance into a trust, and hold Morgan to all the responsibilities and liabilities of a constructive trustee. Gibson states the rule in this language:—"Where a person procures the legal title to property in violation of some duty, express or implied, to the true owner . . . equity, for the purpose of doing justice in the most efficient manner, constructs a trust out of the transaction, and makes a trustee out of the person thus acquiring the title." Gibson's, Section 931. This rule is of such universal application as to make unnecessary citation to supporting cases.

The fact that in a given case the owner of the property may have received what seemed to be or what in reality was a fair price for the conveyance to her agent is of no consequence in the application of this rule which

constructs the trust. When the agent has been guilty of a breach of a material duty owed his principal by reason of the fiduciary relation of principal and agent. It was so decided in our leading case of *Tisdale* v. *Tisdale,* 34 Tenn. 595, 608, 64 Am. Dec. 775, wherein this court said:—''Where confidence is reposed, duties and obligations arise which equity will enforce. A trustee cannot throw off the trust at pleasure, to the injury of the *cestui que trust.* He will not be allowed to mix up his own interests and affairs with those of the beneficiary. This doctrine has its foundation not so much in the commission of actual fraud, but in that profound knowledge of the human heart, which dictated that hallowed petition, 'lead us not into temptation, but deliver us from evil,' and that caused the announcement of the infallible truth, that 'a man cannot serve two masters.' The right to sell and to buy cannot exist in the same person, because of the antagonistic interest in the two positions. Hence the fairness or unfairness of the transaction, and the comparison of price and value, or the existence or absence of actual fraud, are not permitted to enter into the consideration of the court. It is enough that the relation of trustee and *cestui que trust* existed. This appearing, the investigation is at an end, and the doctrine applies with all its force.'' This case is frequently cited and widely quoted as a clear statement of the general rule. Its decision above quoted is grounded upon the reason which gave origin to the creation by equity of constructive trusts; namely, to remove from fiduciary relationships the temptation to take advantage for personal gain of opportunity necessarily presented by such a relationship to commit a fraud without much danger of sufficient proof to establish such fraud.

The principle is stated in this language in 21 Ruling Case Law, page 830, wherein the relations between prin-

cipal and agent are under discussion:—''The doctrine is not based on the idea that the transaction is necessarily an injury to or a fraud upon the principal, but on the idea of closing the door to temptation to fraud and keeping the agent's eye single to the rights and welfare of his principal. And the interdiction is enforced with a strong hand in courts of justice. The principle is one of prevention, not remedial justice, which operates therefore, however fair the sale may have been—however free from every taint of moral wrong.''

As stated in the text quoted and in the *Tisdale Case*, the rule is intended equally as much as a preventitive of fraud as it is to supply a remedy to the party defrauded. Hence, equity constructs the trust where the agent has been guilty of a breach of fiduciary duty without regard to whether the principal received a fair price for the conveyance of his property to the agent. So, it is immaterial that Mrs. McNeill received what appeared to be a fair price for the property when she conveyed it to her agent Morgan as trustee. By reason of his wrong, he must be held to have taken title thereto as her constructive trustee with all the obligations and liabilities pertaining to such a trust. One of these obligations was to account to his *cestui que trust*, Mrs. McNeill, for the proceeds of any re-sale by him of this property. It is certain that as between the two any profit of such re-sale was the profit of the *cestui*, Mrs. McNeill. Equity will not allow him to keep that profit for himself, but will require him to pay it over to her. *Leiper v. Ransom,* 42 Tenn. 511, 514; *Moinett v. Days,* 60 Tenn. 431; *Hancock v. Horne,* 134 Tenn. 107, 183 S. W. 520. It is appropriate to observe in this connection that he violates his duty just as much as in a sale to himself ''if, unknown to his employer and in the latter's behalf, he undertakes to sell

to or purchase from one to whom he is related by the ties of kindred, for his natural desire to favor his own would be more or less detrimental to the interests of his employer." 20 L. R. A. (N. S.), 1160 note.

It being clear that Morgan became a constructive trustee with all the attaching responsibilities and liabilities thereof, including the duty as between himself and her to pay over to her the profit of a resale, then by way of analysis, it may be very logically asked:—Is Morgan to be relieved of this responsibility and liability, or is Mrs. McNeill to be deprived of her equitable right against him to this profit because Morgan so arranged it that his own mother, instead of himself, received the profit which he as constructive trustee was bound in equity to turn over to Mrs. McNeill? If this be true, then the very wrong which constructed the trust and created this obligation upon his part relieved him from any liability for not carrying out that obligation, in that his withholding from Mrs. McNeill information of his arrangement for his mother to receive the profit, if any, created this responsibility by way of a constructive trust, whereas, the carrying out of that secret arrangement by paying the profit over to his mother relieved him of liability for not fulfilling that responsibility to Mrs. McNeill. This Court does not think so. Upon close analysis of this situation it becomes apparent that the whole purpose and efficacy of a constructive trust would be very easy to defeat if the constructive trustee by this means is enabled to denude himself of his character of trustee without performing the trust. It would very frequently be very easy for the agent to secretly arrange, or say that he arranged, for his mother or some other very close and near relative, instead of himself, to receive the profit resulting from the initial wrong transaction and thereby escape the consequences

of his own wrong. "The jurisdiction exercised by courts of equity over the dealings of persons standing in certain fiduciary relations has always been regarded as one of a most salutary description. The principles applicable to the more familiar relations of this character have been long settled by many well-known decisions, but the courts have always been careful not to fetter this useful jurisdiction by defining the exact limits of its exercise." *Crossman* v. *Keister*, 223 Ill. 69, 79 N. E. 58, 62, 8 L. R. A., (N. S.), 698, 706 114 Am St Rep. 305.

The facts of the instant case fail to justify the taking of this case from under the general rules hereinabove stated. To the contrary these facts strongly invoke the application of these rules to this case. It is the opinion, therefore, of this Court that Morgan as constructive trustee and, *ipso facto,* individually, must be held to account to Mrs. McNeill for the proceeds of the re-sale of this residence to Mrs. Parsons. Other jurisdictions which have had presented the question of the liability of the agent as a constructive trustee when the profit of a re-sale went to a third party have held the agent liable to his principal, the *cestui que trust* for this profit, as do we under the particular facts of this case. See *Wendt* v. *Fischer et al.,* 243 N. Y. 439, 154 N. E. 303. The method of accounting should be the same as that pointed out in *Leiper* v. *Ransom,* 42 Tenn. 511, 514, 515: "It appears that the defendant sold the land in 1856, and he must be held liable as trustee; and as such, charged with the proceeds of the sale, or the cash value thereof, at the time the same was received. . . . He will be credited with all such sums, as he may have paid in and about his said trust, also . . . including a just compensation."

 It follows from what is herein held that Morgan was guilty of a conversion in transferring these

purchase money notes to his mother. In conversion of choses in action, the face value is *prima facie* the actual value. 26 R. C. L., page 1150. Measured by this rule, the proceeds, cash and notes, received by Morgan had a cash value of $3,850. Aside from the rule, from a practical view, the purchase money notes of $3,000 appear to have face value. They are secured by a first and second lien on this residence and are prior to every other lien, except taxes. They bear an attractive rate of interest and are being promptly paid each month, as we have before observed. Morgan, Trustee, and individually is accordingly chargeable in his accounting with Mrs. McNeill with the sum of $3,850. The joint compensation of himself and his principal Dobson-Bainbridge Realty Company is 5% of the $3,850 for which the property was re-sold to Mrs. Parsons. He is entitled also to the credit of $2,517.50 previously paid to Mrs. McNeill. This leaves a balance of $1,140, for which Mr. Morgan is liable. The court of appeals decreed that this judgment should bear interest from the date of the filing of the bill, and that is not complained of by Mrs. McNeill.

 Morgan was an employee or agent of the Dobson-Bainbridge Realty Company in soliciting the listing of this residence for sale as real estate brokers. This company referred Mrs. McNeill to Morgan as one of their agents in charge of the sale of realty. This company participated in the profits of both sales. It issued its check to Mrs. McNeill when the conveyance to Morgan, Trustee, was executed. It follows that without regard as to whether this Realty Company was actually aware of the wrong committed by its agent it, the company, and the surety on its bond is likewise liable.

It results that all errors assigned in the petition must be overruled and that the decree of the court of appeals rendering judgment against each and all of the defendants for $1,140 with interest from August 16, 1944, together with costs is affirmed.

CHAMBLISS, J., not participating.