574

LEAKE *v.* GRAY, SHILLINGLAW & CO.

(*Nashville*, December Term, 1949.)

Opinion filed December 10, 1949.

Rehearing Denied February 10, 1950.

FYKE FARMER, of Nashville, JOHN M. BARKSDALE, of Nashville, for petitioner.

BASS, BERRY & SIMS and F. A. BERRY, of Nashville, for respondent.

MR. JUSTICE BURNETT delivered the opinion of the Court.

The original bill in this case was filed on August 23, 1939, by Leake against Gray, Shillinglaw and Company, for an accounting with the defendants growing out of a contract involving the purchase and sale of a large number of shares of the capital stock of the Tennessee Products Corporation.

After taking a considerable amount of proof, over a period of three or four years, the bill was amended on January 20, 1943, and a supplementary bill filed making additional defendants and alleging that the complainant had been induced to enter into the contract referred to in the original bill by fraud and misrepresentation and that the original defendants, as well as those made parties by the supplemental bill, had violated and breached the contract and entered into it for the purpose of defrauding the complainant. The amended and supplemental bill prayed that the contract be rescinded and set aside because of the alleged fraud and deceit practiced.

The Chancellor dismissed the bill for various reasons. Among others were; that due to the long duration of

time, since there was any breach of the contract, it would be impossible to place the parties in *status quo* if a rescission were made; that the complainant had not proceeded "with diligence and dispatch" when the alleged breach first became known to him and that he was guilty of "unnecessary and unexplained delays in presenting his case"; that any breaches of the contract were made "with the knowledge of" the complainant and after having knowledge of this fact accepted the benefits of the transaction. The Chancellor was further of the opinion that the acts of the defendants were not to defraud or injure the complainant but were done so as to market the stock in an orderly manner, and that, the complainant had suffered no damage by reason of the acts of the defendant.

The Court of Appeals in its original opinion and in a very forceful opinion on a petition to rehear concurred with the Chancellor in his conclusions and in his finding of fact and likewise dismissed the bill.

A very forceable and unusually well prepared petition for *certiorari* has been presented. We, after considering this petition and the record, granted *certiorari*. Argument has been heard. We have spent several weeks reading this large record and the many exhibits filed to the various depositions taken herein. The record of the testimony is something near 1500 pages. Many briefs have been filed which have been read by us at least two and some three times. All through this entire record arguments are made by respective counsel as to various and sundry points so that after one has read this record carefully the propositions presented really have been rather thoroughly argued and stated by counsel.

At one point in the record counsel for the plaintiff makes the very frank statement that "this is really a discovery, where I can make an intelligent election,— ", in other words it is perfectly obvious in reading this record that the complainant began this lawsuit feeling that he had a right of recovery but not knowing just where or how this right should be laid. Consequently the amended and supplemental bill was filed some years after the original suit was begun and the basis of the action was then turned into and became one for fraud and deceit.

Both courts or at least the Court of Appeals by specific word has held unqualifiedly that the defendants were not guilty of any act of fraud or deceit in the matter. The finding of fact of the Chancellor could be greatly improved on and would be of much benefit to an appellate court if it was more specific. This memorandum, as filed by the Chancellor, is more of a statement of his conclusions and his reasons therefor than a specific finding of fact. Yet there are certain facts found in this memorandum of the Chancellor which were concurred in by the Court of Appeals and in these instances of course we are bound thereby and cannot go back of this concurrent finding. "The concurrent finding rule above mentioned binds this court not only as to the concurrent finding of facts, but applies, also, to concurrently found inferences, if justifiably drawn, from these facts." *Conaway* v. *New York Life Ins. Co.*, 171 Tenn. 290, 293, 102 S. W. 2d 66, 67. What these concurrent findings are will be referred to more specifically later on.

The great bulk of this large record is made up of the depositions of the various defendants or their employees. Almost all of these witnesses, defendants and their em-

ployees, were called and offered as witnesses on behalf of the complainant. It results, therefore, and the record clearly shows it page after page, that in questioning these defendants and their employees as witnesses for the complainant, that the complainant is very suspicious of what they say and of their answers to his respective questions. This naturally brings about a situation of where counsel is more or less trying to cross-examine the witnesses whom he has offered on behalf of his position. The record being in this plight the complainant is left in the position of having his witnesses testify adversely to his contention. His only recourse then is to take their testimony and the various exhibits offered thereto and draw a different inference or different conclusion from their testimony than that which the witnesses have stated. As heretofore said the two lower courts disagreed with counsel, for the complainant, and agreed with the defendants in their contention on the various aspects of the case.

The Court of Appeals in its first opinion makes a very fair and full finding of fact which unquestionably is what the record shows. This finding of the Court of Appeals is as follows:

"The complainant Frederic Leake entered the employment of the Bon Air Coal & Iron Company, in 1917, and became its Secretary, serving as such until the corporate name was changed about 1927. He then became President of the successor corporation, the Tennessee Products Corporation and served as such until 1939. A reorganization of the corporation took place under Section 77B of the Federal Bankruptcy Act and was effective January 1, 1937. The plan for reorganization provided for the issuance of common stock of the new corporation to the holders of debts of the old corporation. The Estate of

Wm. Wrigley, Jr., of Chicago was issued something over 100,000 shares of this stock, and large blocks of same were issued to others, including the American National Bank of Nashville, about 150,000 shares and Paul M. Davis, about 16,500 shares. Under these circumstances it was considered advisable to prevent if possible large blocks of this stock from being placed upon the market for sale at or near the same time. Late in December 1936 the American National Bank gave an option to some stockbrokers, Campagnoli and Company of New York City, H. S. Edwards & Company of Pittsburgh, Pa. and Gray, Shillinglaw and Company of Nashville, to buy its stock, at intervals from January 8, 1937 to August 8, 1937, in blocks of 25,000 and 50,000 shares, at prices of $3.50, $3.75 and $4.00 per share.

"The complainant was on very friendly terms with the representatives of the Wrigley Estate in Chicago and after conferences with Paul M. Davis and R. A. Shillinglaw it was agreed that if Leake would get an option to purchase the Wrigley stock, Davis and Shillinglaw would finance its purchase and share any profits in its sale with Leake. Leake did secure the option to purchase 103,194½ shares of stock at $2.00 per share. It was then that a contract in writing was entered into between Leake, Davis and Shillinglaw.

"This contract is as follows:

" 'Agreement made this 21st day of January, 1937, by and between Frederic Leake of Nashville, Tennesse, Paul M. Davis of Nashville, Tennessee, and Gray-Shillinglaw & Company (a Corporation) hereinafter for convenience called 'Gray', a Corporation of Nashville, Tennessee.

" 'Witnesseth:

" '1. The said Leake has an option on between 103,000 and 104,000 shares of common capital stock of Tennesse Products Corporation, recently issued pursuant to reorganization at the price of $2.00 per share, which he agrees to exercise and have said stock delivered at Nashville, at an early date, issued in such name or names as Gray shall designate.

" '2. The said Davis and Gray agree to advance a sufficient amount of money to pay for said stock in full, including cost of transportation and expenses, if any, of issuing same.

" '3. Upon receipt of said stock all shares of stock in excess of 100,000 are to be delivered to Leake, free and clear of any claim by Davis and Gray.

" '4. The remaining 100,000 shares of stock are to be delivered to Gray, with authority in said Gray to sell same for the best price obtainable, but in no event less than $6.00 per share, without the consent in writing of Davis and Leake first being obtained.

" '5. Gray shall have the exclusive right to sell said shares of stock from time to time at such price not less than $6.00 per share, and in such manner as it may deem desirable and for the best interests of the subscribers to this agreement. The said Gray shall likewise have the right to buy and sell stock on the open market and execute orders for the buying and selling of stock for others, or in its own name, without dealing with the shares of stock herein mentioned in its discretion, and without accounting for such sales not affecting the stock deposited with it as herein mentioned. During the pendency of this agreement the said Davis and Leake, shall not buy, sell or deal in common stock of Tennessee Products Corporation except through Gray, or with its consent.

" '6. The said Gray shall have the express right to sell said stock at wholesale to other dealers, allowing such discount or commission to dealers as it deems desirable, provided always the net price for which such stock is sold is at least $6.00 per share.

" '7. The proceeds arising from the sale of said stock shall be used first to repay the amount of money advanced by Davis and Gray, together with interest thereon from the date of advancement, at the rate of 6% per annum until such amount has been paid in full, and thereafter shall be divided 40% to Leake, 30% to Davis, and 30% to Shillinglaw.

" '8. This agreement shall last until the entire 100,000 shares of stock are sold, but in no event longer than six months from this date unless this agreement is extended by the unanimous consent of the three parties hereto, and such extensions may be had from time to time as the parties may agree upon by notation hereon.

" '9. At the termination of this agreement if all of the shares of stock are sold, division shall be made as hereinabove provided. In the event any shares of stock are remaining and the entire amount advanced by Davis and Gray has not been repaid in full, the remaining stock shall be divided 40% to Leake, 30% to Davis, and 30% to Gray, and each of them shall contribute the same proportion of the amount remaining due from the advancement made by Davis and Gray, together with interest thereon, so that the entire advancement made by them shall be paid in full. If such advancement has been paid in full on the date of the termination of this agreement any unsold stock shall be divided in the above proportions, without any further or other payments, but settlement shall be

made at the same date of any balance in the hands of said Gray.

" '10. In figuring the sale price of stock if sold through another broker, any commission charged to said Gray by such broker shall be considered a part of the selling expense, and any taxes, including stamp taxes paid in reference to such sale, shall be considered a part of the expense of sale, but Gray shall not be entitled to any overhead expenses for its own organization.

" '11. Any of the parties hereto may assign all or any part of the interest of any subscriber hereto, to a third party, and on giving notice to Gray of such assignment the said Gray shall make settlement in accordance therewith, and the receipt of such assignee shall be a full release and discharge of said Gray.

" 'In Witness Whereof, the parties hereto have set their names on the day and date first above written.

" 'Frederic Leake
" 'Paul M. Davis
" 'R. A. Shillinglaw,'

"It is noted that this contract specifically authorizes Gray, Shillinglaw and Company to deal in stock on the open market, other than the stock covered by the contract.

"The Wrigley stock was received in Nashville on February 2, 1937, and Gray, Shillinglaw and Company issued its check to pay for same in the amount of $206,389.00. Certificates for 3,194½ shares of the stock were delivered to complainant.

"Accounts were opened on the books of Gray, Shillinglaw and Company, showing 40% owing by Leake or $82,560, 30% by Davis, or $61,920.00 and 30% by Gray, Shillinglaw and Company or $61,920.00.

"Gray, Shillinglaw and Company at once began its efforts to sell enough of this stock to pay for it through its connections Campagnoli and Edwards and did secure an offer for 41,898 shares for $206,557.14, enough to pay for all the Wrigley stock and cancel the indebtedness charged against Leake, Davis and Shillinglaw. This offer amounted to $4.93 per share. The matter was discussed between Leake, Davis and Shillinglaw and Leake declined to accept less than $6.00 per share for his proportion of the stock. Davis and Shillinglaw then, with Leake's knowledge and in order to get them all out of debt for the purchase price of the stock and secure $6.00 per share for Leake's stock, agreed to donate enough of their own stock to make the offer average $6.00 per share. Davis donated 3,500 shares and Shillinglaw contributed 4,000 shares. The sale was consummated and the indebtedness charged against each of them was thus cancelled.

"Afterwards and in the latter part of July 1937, certificates for 26,240 shares of Tennessee Products Corporation stock were delivered to complainant. This was his 40% of the remaining stock after the debt for the purchase price was paid. The complainant accepted this stock without prejudice to his right to make complaint later. The defendants insisted that there was a settlement in full of the obligations of the contract. The original bill was filed about two years later in August 1939."

In the petition for *certiorari* the petitioner states that: "The question here involved is whether two parties negotiating with a third party to enter into a joint adventure, or agency agreement, for financing the purchase of a block of stock to be turned over to one of the parties for sale for the best interest of three parties are in good faith bound to disclose to such third party such material facts

as are unknown to such third party as will enable him to form a reasonably correct opinion and conclusion as to his best interest before signing the contract."

The matters which are alleged not to have been disclosed, but fraudulently concealed, and which are the basis for the amended and supplemental bills asking that the entire contract be rescinded are as follows:

(a) That before entering into the contract hereinbefore quoted, the defendants had already obligated themselves to certain eastern brokers to keep the Wrigley stock off of the market.

(b) Before entering into the contract, complainants had entered into an agreement with eastern brokers to keep the Wrigley stock off of the market till after July 1, 1937 by selling to these eastern brokers 41,898 shares of the Wrigley stock at $4.93 per share; and

(c) that the defendants had entered into such contract with the eastern brokers prior to signing the agreement hereinabove quoted with the complainant.

The Court of Appeals found as to these three propositions that: "The proof shows that defendants did not obligate themselves to keep the Wrigley block of stock off of the market. On the contrary, it was the purpose of the brokers to establish a market and market all of this stock at $6.00 per share, if possible. Likewise, the proof shows that this sale of 41,898 shares to Campagnoli was not in consideration of any agreement to keep the rest of the Wrigley stock off of the market. There was no such agreement and no such condition attached to that sale."

These findings and statements of the Court of Appeals are fully supported by the record. Mr. Shillinglaw states very positively that he had no such idea of tying

up this stock to keep it off of the market but it was done so that the stock might be marketed in an orderly plan. As to what this plan was he said: "Was to take up stock from weak holders, and redistribute stock over a great number, through a great number of investment dealers and investors all over the country who wanted to purchase this kind of stock."

He and a number of other officers of Gray, Shillinglaw & Company, as well as Mr. Davis, all testify that they did everything that they could to properly market this stock but that it was necessary to build the market up in the manner above described to have the market in a position where the stock would bring $6 per share. It clearly appears from the testimony of all of these witnesses, most of whom were offered on behalf of the complainant, that this was their purpose and that there was absolutely no intent to otherwise keep the Wrigley stock off of the market. They say, and the record shows, they were trying to build the market up where it would produce the price as required by Mr. Leake of $6 per share.

The two lower courts concur in the finding of fact that Mr. Leake knew at the time of the sale of this 41,000 shares of stock to the eastern brokers that the stock was sold for less than $6 per share. It is true that this sale was made, according to the testimony, as soon as the contract was signed and, (according to the concurrent finding) this was then made known to Mr. Leake and he refused to acquiesce or to agree thereto. If this was a breach of the contract (it was a breach of Section 6 thereof) Mr. Leake certainly cannot wait until more than two years thereafter before complaining about the matter. In other words he cannot wait to complain until he sees that this did not turn out to his advantage. He should

have taken some action immediately. He knew of this breach of the contract, by the other parties thereto, some two weeks prior to the time that this stock was transferred to the eastern brokers. Clearly it was his duty and obligation if he thought that this breach of the contract was injurious to him, and if he had any complaint thereof, to take immediate action. Action could have been taken before the delivery of the stock to the defendants herein and before their delivery to the eastern brokers and he could have gotten redress at that time if he was entitled to it. By his waiting until the end of his contract and for eighteen months to two years thereafter, he has clearly waived this breach of the contract.

By thus remaining silent when he knew that this section of the contract was being breached, he allowed this stock to be distributed over the country among various and sundry other people. He likewise by his silence and acquiescence therein (by taking no action other than not consenting to the sale for less than $6) in effect acquiesced in the future action of these brokers. "In equity the return or offer to return the consideration of a contract sought to be vacated for fraud is not a condition precedent to the institution of such a suit. This for the reason that a court of equity has power to adjust the rights of the parties, and to impose by decree such terms on the complainant as may be equitable." *Hawkins* v. *Byrn,* 150 Tenn. 1, 12, 261 S. W. 980, 983. No offer of restitution was made by the complainant herein because he had sold off all of his stock. The record fails to show what he received for it. By the complainant's inaction in the beginning he allowed the defendants to dispose of their stock. For this reason alone a rescission could not be equitably decreed.

588

■ The Court of Appeals in its second opinion finds that the complainant was "fully informed of what these brokers were undertaking to do." They cite reasons therefor. Mr. Davis when called as a witness on behalf of the complainant said: "Yes, I told Mr. Leake, what we were doing". Counsel for complainant then, in what amounted to a cross-examination of Mr. Davis, tried to belittle this statement and pin Mr. Davis down as to when Leake was given this information. Mr. Davis was of course after these many years unable to definitely say when such information was given to Leake. The Court of Appeals agreed to accept Mr. Davis' version of the matter. We see no reason to disagree with the findings of the Court of Appeals therein. The Court of Appeals further says: "Its plain intent was to tie this Wrigley 100,000 shares into the market operation plans of these brokers. It put these shares into the hands of one of these brokers (Gray, Shillinglaw & Company), kept Davis and complainant from dealing in this issue except through this broker, gave the broker exclusive authority to sell these shares for the best interest of the parties at not less than $6.00 per share at such times and in such manner as the broker deemed desirable, and left the broker free, either as agent for others or as principal for itself, to buy and sell other shares of this issue. That is, it did not exact of the broker undivided loyalty to the seller but left it free to represent both the buyer and the seller." This is the clear import of the latter part of Section 5 of the contract and we feel that the Court of Appeals was amply justified in making such statement from the facts as they appear in this record.

The complainant before signing the contract hereinabove quoted objected to certain portions thereof and

wanted it changed so as to provide that: "No other stock available to you (this broker) was to be given preferential treatment in sales." Counsel for the defendants explained to counsel for the complainant why such a change was not acceptable. After a conference between these two attorneys the writing as hereinabove copied and as drawn by counsel for the defendant was acquiesced in by counsel for the complainant. These matters in reference to this conference between these two lawyers were reported in a letter from counsel for the defendants to counsel for the complainant. A part of this letter is pertinent here, we quote it. ". . . I explained to him (Mr. Farmer) fully that you were interested in options or purchases of other stocks and had a contract with other brokers regarding it, and that it was your intention to form various sales organizations with others and that stock, perhaps including the Leake stock, would be transferred to such organizations at a set price and that this would constitute a sale of the Leake stock insofar as he was concerned, and he would not share in either profits or losses which might result thereafter, and which might if a profit were realized pay you an additional sum on the stock."

After these facts were made known to complainant's counsel and after complainant had been advised thereon he signed the contract.

It seems to us that a man of intelligence, even though he knew nothing of stock market manipulations, must have known that these brokers who were skilled in this procedure were doing something to try to build this stock up to the price that he required for his stock. It was clearly to their advantage to build this stock to this price. They, the broker and the banker, had 60% of the Wrigley

issue while the complainant had 40%. Then too, the banker, individually, had something over 16,000 shares of this stock and institutions with which he was affiliated had a great deal more. It is human nature that these men who knew stock manipulations or stock marketing as it probably should be called would do everything in the world they could to so market this stock as to make it bring a maximum price and if possible try to build the market up to a position where it would bring at least the figure asked for it by Mr. Leake. They all so testify, there is nothing in the record to show to the contrary. To establish fraud or deceit or things of the kind, there must be some evidence thereof or the court must be able to clearly see from the acts of the parties that they have deceived or defrauded the other parties to their unjust enrichment.

The whole thing here amounts to a question of whether or not the brokers manifested fair play in their dealings with the complainant. Fair play always depends upon the facts of each separate case. No general rule can be laid down to apply in all cases. One of the first requisites of fair play or good faith would be a full and frank disclosure of all relevant information that the agent had of the matter. He should tell his principal what he knows of the extent of the principal's interest etc., about the purposed transaction. As heretofore said the weight of the proof here is that Mr. Leake did know, at least on or about the day of or shortly after the signing of the contract, what these parties were attempting to do. He, to say the least, was put on notice of what they were going to do when he learned they had sold a portion of this stock for less than $6 per share. Then too, he, by his contract, consented to Gray's right to buy and sell on the open market. It seems to us that the clear intent of

this was to give the broker the chance to try and build up the market to the Leake price. He knew the price was far below this when he made the contract. It is seen here that the broker, Shillinglaw, according to his testimony, and there is nothing to contradict this, tried to get $6 for the Wrigley stock that was sold to liquidate this original debt. When he was unable to do so he worked out the best way possible. This fact, as repeatedly said, was known shortly thereafter or probably the same day by Mr. Leake, both by verbal and written communication. These actions clearly show that the broker was looking out for the interest of Mr. Leake as well as for the interest of himself and the other party to the contract, Mr. Davis. The first thing that he had in mind was to liquidate this large indebtedness of the three parties. As soon as this was liquidated then the stock left over in 40-30-30 proportions belonged to these three parties without any liability on any of them.

■ Good faith or fair play was really what the attorneys for the respective parties agreed upon in discussing the contract prior to its signing, as evidenced by a portion of the letter hereinbefore quoted. The Court of Appeals said: ''The proof shows that he (Shillinglaw) tried in good faith to sell the rest of the Wrigley block of stock and that the market was never in condition to absorb such a large block at the price of $6.00 per share.''

We fully agree with the statement last quoted. The evidence overwhelmingly supports this statement.

It is true that there is evidence herein of various and sundry sales of small amounts of this stock all the way from $2.25 up to $7 dollars or possibly a little better during this time. The evidence is that these sales were part

of the recognized marketing plan to build the stock up to a valuation of $6 per share or better. There is no evidence to the contrary. We cannot take positive evidence and statements of the kind and reach a contrary opinion when there is no evidence otherwise.

 MR. JUSTICE CARDOZO, when he was an Associate Justice on the Court of Appeals of New York, in the case of *Sinclair* v. *Purdy*, 235 N. Y. 245, 253, 139 N. E. 255, 258, said: "It is not the promise only, nor the breach only, but unjust enrichment under cover of the relation of confidence, which puts the court in motion."

In other words, the court will not declare a constructive trust in cases where there has been a breach of promise unless there is some unjust enrichment under or rising out of the confidential relations of the parties. This is a very logical and sound conclusion because otherwise the courts might and would be congested with litigated cases, particularly in cases of the kind here, where the parties had made some promise and then could not or did not carry it out and no one had been hurt by this breach. Of course, it is true that the courts have universally held, and properly so, that when one in a confidential relationship does make a promise and then breaches it that he will be penalized for his breach of this promise or relationship; but if the parties cannot be put back in status quo or equity cannot be done due to the passage of time, etc., then clearly there is no ground for a rescission. If a rescission is asked it should have been asked in the outset, as soon as the breach of this contract was learned, it could have been done then without any stock being transferred to a third party. It seems to us clearly when one stands by and acquiesces in such a breach, and then waits to see whether they are going to profit or other-

wise by said breach before taking any action, then the party who does this should be precluded from bringing any action therefor.

The Court of Appeals in two separate opinions, apparently prepared by different members thereof, show that that court has given this record a thorough study. In both opinions the Court of Appeals finds that there is no proof in the record to justify any conclusion that a fraud was perpetrated on the complainant. We have very carefully read this record and examined these exhibits as well as the briefs and the authorities offered on behalf of complainant and fully concur with the statement of the Court of Appeals that there is no evidence of any fraud perpetrated on the complainant herein.

The contract signed by these parties, under Section 5 thereof, gave the broker the ''right to buy and sell stock on the open market and to execute orders for the buying and selling of stock for others, or in its own name, without dealing with the shares of stock herein mentioned in its discretion, and without accounting for such sales not affecting the stock deposited with it as herein mentioned.''

It was under this section of the contract that this broker dealt with this stock of others and tried, as he and all of his officers and Mr. Davis say, to work out a plan for distribution of the stock so as to build the price up. In doing so he was doing so for his own benefit as well as for the benefit of all parties to this contract. We cannot see how this was any fraud or deceit perpetrated on this complainant. It is probably true, and it seems perfectly reasonable and normal, that this broker did not consult the complainant with every sale that he made. In the first place he was given authority to do these

things by the contract and in the second place it was to his interest, as well as that of the complainant, to try to build this stock up to the point where it would be worth $6 per share. The evidence without contradiction shows that if the large block of stock which this complainant had was put on the market, the market would have dropped far below the $6 dollar point. It was clearly the intention of the parties when they entered into this contract to try to build up the stock to where it would bring a larger sum. Clearly Mr. Leake was informed, the evidence so shows, that at the time that he entered into this contract the stock was being sold for $2.25 on up to $3 or $4 in small blocks. Another thing convinces us that he must have had some knowledge that there was at least some kind of a plan on foot to try to work out an increase in the market of this stock. When he, the complainant, went to the Wrigleys to buy the stock they did not sell it to him for this $2 until his offer was submitted to their bank or banker and he (the banker) investigated the matter and decided that that was a good sale on behalf of the Wrigley Estate. There was no claim or thought that the Wrigley Estate was selling this stock to Mr. Leake as a gift or in some way to try to help him out. It was the duty and obligation of the executors of the Wrigley Estate to get as much for the stock as they thought the market would reasonably stand at the time. It is a clear inference, and logical deduction, that this banker, who was consulted on behalf of the Wrigley Estate about this, concluded that $2 was a fair price for the stock at the time. All of these things convince us of the fact that Mr. Leake must have known that there was some kind of a plan on foot to market the stock in some reasonable way. He agreed that the way this was

done should depend upon the good faith or fair play of the broker in marketing it. This the broker did, that is, marketed it in good faith.

As heretofore said, we have given this case an unusual amount of thought and study. We have carefully read all of the authorities cited. These authorities state without doubt sound propositions of the law of fiduciary relationship and where a constructive trust will and should be declared by a court of equity. Under the facts of this case we fail to see the applicability of the authorities cited. The case of *McNeill* v. *Dodson-Bainbridge Realty Co., Inc., et al.*, 184 Tenn. 99, 195 S. W. 2d 626, was decided by the same Chancellor who decided the instant case. This Court in the McNeill case affirmed the Chancellor in holding that there was a breach of fiduciary relationship in that case and that it was a proper case for the application of the doctrine of constructive trusts.

Many sound and salutary equitable principles of law are ably set forth in the accompanying brief to the petition for *certiorari*. These principles have been ingrafted to our fundamental law over a period of years. Equity has demanded that these principles develop as proper factual situations have developed. Under the facts of the instant case equity does complete equity in the conclusion of the Chancellor dismissing the complainant's suit at the cost of the defendants. Under a factual development as here equity requires an exception to the principles relied on.

Equity will not enforce its rules when to do so would be an inequity.

We are fully satisfied, there is absolutely no doubt in our minds, that under the facts as presented in this rec-

ord, the two lower courts were correct in their decision. We have very carefully examined each and every assignment of error and are fully satisfied that no prejudicial error has been committed below. It, therefore, results that their decree will be affirmed with costs.

All concur.

## On Petition to Rehear.

The petitioner states that: "A rehearing is sought on the basis that the court overlooked a material fact in its opinion and, hence, was in error in finding that Mr. Shillinglaw's testimony as to the marketing plan was true."

The petition then proceeds to reargue fact questions which have heretofore been ably argued. This argument is hinged on the weight we should give a letter written by Mr. Shillinglaw on January 21, 1937 (the day the contract was entered into), as showing the opposite from our conclusion in considering the record as a whole.

We very definitely considered this letter in arriving at our original conclusion. It was the basis of one of the assignments of error. We made a detailed investigation and examination of this entire record in arriving at our former conclusion.

It is beyond the realm of reason to think that we should take up, in an opinion, each factual development and weigh one against the other. We must, and do, take the record as a whole, and, from this, arrive at what we consider a fair and just conclusion. We have done this. We are sorry counsel does not agree with our findings and conclusions. We cannot make these findings and conclusions as counsel on the one side or the other insists. We arrive at these findings and conclusions from the record as a whole.

This letter, which is again called to our attention, was a part of the evidence we considered when we adopted the statement of the Court of Appeals. We followed this with our reasoning of why we thought this correct. We see no reason to change this view.

Finally, complaint is made that counsel was not allowed to argue various and sundry factual situations in the case but were limited to arguing whether or not there was a concurrent finding. Be this as it may, we considered every possibility in the case in drafting our original opinion. We spent weeks in studying and reading this record, etc. We view the matter impartially and not as an advocate for the one side or the other. We very carefully considered each of the developments of this case (now said not to have been argued) in arriving at our original opinion. We have no hesitancy in saying that we think we are correct in our findings and conclusions therein.

In our original opinion, we said: ''These matters in reference to this conference between these two lawyers were reported in a letter from counsel for the defendants to counsel for the complainant.''

The last four words of this sentence are inaccurate as is shown by the quoted letter immediately following the above quoted sentence. These four words ''counsel for the complainant'' are hereby stricken and ''Mr. Shillinglaw'' inserted in their place.

The petition to rehear is denied. The costs of the cause on appeal are taxed against the appellant, complainant below.