**Walter TANNER, Charlotte Paul, Jane Fraley, Faye Sivazlian and Tom Tanner, Appellants,**

v.

**James H. TANNER, Randall Keith Tanner and Morine Tanner, Appellees.**

Supreme Court of Tennessee, at Knoxville.

Oct. 28, 1985.

Rehearing Denied Jan. 13, 1986.

Dennis R. McClane, Baker, Worthington, Crossley, Stansberry & Woolf, Wanda G. Sobieski, Baker, Worthington, Crossley, Stansberry & Woolf, Knoxville, for appellants.

Joe M. Looney, Looney, Looney & Conner, Crossville, for appellees.

## OPINION

FONES, Justice.

This is a dispute over 213 acres of land in Cumberland County. G.M. Tanner's five children born of his first marriage to Ruth are plaintiffs and two of his four children born of his second marriage to Morine, and Morine, are defendants.

In 1950, G.M. Tanner conveyed the 213 acres to Ruth as alimony, as ordered by the divorce court. Ruth died shortly thereafter, intestate, leaving the five plaintiffs as her heirs at law. G.M. Tanner used the property throughout his life, with the knowledge and consent of plaintiffs and paid the taxes. Unknown to plaintiffs, G.M. Tanner procured and recorded a deed from his brother conveying an undivided one-half interest in the 213 acres, about ten years after the deed which the two brothers had executed to Ruth. In 1980, G.M. and Morine executed a warranty deed to their sons, James and Keith, reserving a life estate to themselves. Plaintiffs contend that their father had acknowledged their ownership of the land until the late 1970's, that his use of the land was with their permission, and his payment of the taxes was for their benefit.

The chancellor held that plaintiffs' action was barred by their failure to pay taxes for 20 years, T.C.A. section 28–2–110 and by T.C.A. sections 28–2–102 and 28–2–103, the two seven year statutes of limitation. The Court of Appeals affirmed on the 20 year tax statute only. We granted permission to appeal because we are of the opinion that a court of equity is bound to construe plaintiffs' father's actions as creating a constructive trust; that as trustee he could not take advantage of his own wrong to create any right, title or interest in the 213 acres in himself; that it follows that because the taxes on the property were in fact paid by him, as trustee, he cannot avail himself of the bar of T.C.A. section 28–2–110, nor of the bar of the seven year statutes.

## I.

Ruth Tanner obtained a divorce from G.M. Tanner in the County Court of Cumberland County in 1949 and was awarded the real property in dispute here, consisting of 213 acres of unimproved and largely uncleared land. The case was transferred to the Circuit Court of Cumberland County where a contempt proceeding was held on February 23, 1950. Apparently some

records of the County Court, including the Tanner divorce decree, have been lost and the original decree is not in the record. However, the decree of the Circuit Court of Cumberland County, entered on February 23, 1950, found G.M. Tanner in contempt because he had failed to execute a deed to the lands described in the decree, failed to pay child support and attorneys fees, and "failed to erect or build the residence or house as set out and provided for in the former decree entered in this cause, and has failed to furnish or supply the fencing and materials as set out in said decree."

Obviously, to purge himself in part from that finding of contempt, he executed a warranty deed in which his brother Roscoe Bud Tanner joined as grantor. The deed contained the usual warranty of title and defense of title.

On the same date that G.M. and Roscoe Tanner executed the warranty deed to Ruth Tanner, she gave her attorneys a note for three hundred dollars secured by a trust deed on the 213 acres. This was the same fee that G.M. Tanner was obligated by the divorce decree to pay. None of the five children of Ruth and G.M. Tanner knew about that note and trust deed until this dispute surfaced in 1977 or 1978.

Ruth Tanner had cancer and after the divorce she lived with her mother until her death in August 1952. Walter Tanner was twenty years old at the time of the divorce and the record does not reflect the ages of the other four children. In November 1952, G.M. Tanner paid the attorneys who had represented Ruth the fee awarded in the decree, procured the release of the lien of the trust deed and took physical possession of the note and trust deed that Ruth Tanner had executed. Defendants assert in this litigation that those papers constitute some sort of muniment of title in G.M. Tanner, but no authority has been offered in support thereof.

G.M. Tanner married Morine Tanner in 1951. They had four children: James, Keith, Edsell and Sue. G.M. and Morine lived between Clarkrange and Jamestown, where G.M. and his brother were in the sawmill business. In 1962 they moved to Cumberland County and lived nearby while G.M. was building a house on the disputed tract. G.M. owned a tract of 150 acres that was adjacent to the 213 acre tract.

On September 2, 1961, Bud Tanner and his wife Elizabeth executed a deed conveying a one-half undivided interest in the 213 acre tract to G.M. Tanner.

On April 13, 1963, G.M. Tanner and Morine Tanner executed a deed of trust conveying the 213 acre tract as security for a $3,000 loan from the Cumberland County Bank, which according to Morine, was used to build a house on the 213 acre tract. After it was completed, G.M., Morine, and the second set of Tanner children moved in.

Sometime in the 1970's, G.M. told two of the plaintiffs that their deed was "no good" and that he claimed ownership of the property. At trial they testified that the event occurred in 1973 or 1974, but post-trial they filed affidavits detailing where they lived and travelled during the period 1973 through 1978 and concluding that their father's declaration of ownership of the property occurred between August 1977 and June 1978, which was the period of time that Faye Sivazlian had lived in Oak Ridge, Tennessee. In her trial testimony she had specifically said that she was living in Oak Ridge at the time her father first told her of his claim. In her post-trial affidavit she explained that she had never been on a witness stand before, and simply made an honest mistake about the date, not realizing it had any significance. Her sister, Charlotte, who followed her on the stand said she simply agreed with her sister without attempting to refresh her memory—further that she was not in the State of Tennessee in 1973 or 1974.

The trial testimony of plaintiffs reveals that G.M. did not inform them that there was a dispute about the ownership of the property until 1978 or 1979, about the time he offered to buy "their deed" for two or three thousand dollars.

It is undisputed that a good relationship existed between G.M. Tanner and the five

children by his first wife throughout his lifetime. They visited their father and were aware of his activities in fencing the property, building the house, cutting timber and paying the taxes. They testified that their father assured them that the land belonged to them until the dispute surfaced in the 1970's; that even after that the good relationship continued until his death.

Faye Sivazlian explained the relationship between plaintiffs and their father, in part, as follows:

We were brought up in an old fashion way and whenever our daddy did something, we said yes sir to whatever he wanted. I never, I would have been embarrassed if he had ever come to me and said I, can I put up a fence. Now it would have embarrassed me that my father would come to me and ask such a question because I knew that he was the one in our family that always made the decisions.

Walter Tanner testified that "it joined this other farm and there was no need, we didn't particularly need the farm and he needed it, to, you know, for his farming operation," that it would not have been morally right to tell their father to give up the use of the farm.

The first time G.M. Tanner ever discussed the ownership of the land with defendant, Keith Tanner, was in 1979, and Keith related the event as follows:

Well, I was sitting on the back porch one evening and my father came up to me and said by now I guess you know that we have a problem with this land. He said that they claimed to have a deed to it and he said I, said I'll give it to you and James. He said you boys work[ed] and made a lot of improvements on it you know and helped building the barn and stuff and take care of the cattle. He said I'd planned on leaving it to you, but he said that they would probably try to take it away from you. He said he didn't believe they'll take it away from me while I'm still alive, but he said after I'm dead I'm sure that they'll try something.

On the thirtieth of June, 1980, G.M. Tanner and Morine Tanner executed a warranty deed conveying the 213 acres to their sons, James and Keith Tanner, preserving a life estate to themselves.

G.M. Tanner died on December 25, 1980, and this suit was filed on May 12, 1981.

## II.

In *McNeill v. Dobson-Bainbridge Rel. Co.*, 184 Tenn. 99, 195 S.W.2d 626 (1946), a real estate agent for the seller, Mrs. McNeill, acted as agent for her mother, as buyer of Mrs. McNeill's property, without disclosure to Mrs. McNeill. He then procured a sale for his mother at a substantial profit. The Court held that the real estate agent had breached a duty owed to Mrs. McNeill with respect to the property she had entrusted to him to sell. Mr. Special Justice Tomlinson, writing for the Court said:

In view of this fact, equity must construct this conveyance into a trust, and hold Morgan to all the responsibilities and liabilities of a constructive trustee. Gibson states the rule in this language:— "Where a person procures the legal title to property in violation of some duty, express or implied, to the true owner . . . equity, for the purpose of doing justice in the most efficient manner, constructs a trust out of the transaction, and makes a trustee out of the person thus acquiring the title." Gibson's, Section 931. This rule is of such universal application as to make unnecessary citation to supporting cases.

184 Tenn. at 107, 195 S.W.2d 626.

Gibson's Suits in Chancery, Fifth Edition describes the doctrine of constructive trusts as follows:

Constructive trusts are so called because they are *constructed* by Court of Equity in order to satisfy the demands of justice, without reference to any presumable intention of the parties; they include cases: 1, Where a person procures the legal title to property in violation of some duty, express or implied, to the true own-

346

er; or, 2, Where title to property is obtained by fraud, duress, or other inequitable means; or, 3, Where a person makes use of some relation of influence or confidence to obtain the legal title upon more advantageous terms than could otherwise have been obtained; or, 4, Where a person acquires property with notice that another is entitled to its benefits. In all such cases, Equity, for the purpose of doing justice in the most efficient manner, constructs a trust out of the transaction, and makes a trustee out of the person thus acquiring the title.[4]

[4] Pom.Eq.Jur., section 1044; 1 Perry on Trusts, section 166.

Whoever deals, in any way, with property which another owns, or has a beneficial interest in, with notice of such ownership or interest, impliedly contracts that he will do nothing prejudicial to the rights of such other person; and that he will, in all his dealings with such property and its profits and proceeds, do whatever good reason and good conscience require. Equity imputes to every person an intention to fulfill his obligations, and will not allow anyone to take an advantage of his own wrong, or to extract a right therefrom. Whenever, therefore, a person takes the title to such property, or its profits or proceeds, in his own name, in violation of this implied contract, a Court of Equity will specifically execute the contract by dealing with him as a trustee, and treating him as one intending to do right, rather than as one intending to perpetrate a fraud. In other words, Equity puts a charitable construction upon his conduct, and thus converts his misconduct into what is called a constructive trust. Collecting money in which another has an interest is such an example. [citing cases including *McNeill v. Dobson-Bainbridge Realty Co. supra.*

2 Gibson's Suits in Chancery, section 977, pp. 205–206 (5th ed., 1956).

*See also Livesay v. Keaton,* 611 S.W.2d 581 (Tenn.App.1980) and *Browder v. Hite,* 602 S.W.2d 489 (Tenn.App.1980).

The chancellor did not give any consideration to actual fraud or constructive fraud on the part of G.M. Tanner.

The chancellor was concerned about the principle that the grantor of the title to real estate cannot hold adversely to the grantee and the grantee's successors in title without a more notorious and explicit assertion of adverse possession than the law requires in other relationships. He quoted from an unpublished opinion of the Court of Appeals holding that mere possession by a grantor for the prescriptive period was not sufficient to characterize the holding as adverse to the grantee, that such holding adverse to the grantee was presumed to be permissive because an adverse claim was repugnant to the covenants in the deed, and further that this was especially true where there was a family relationship between the grantor and grantee. *See* 2 C.J.S. Adverse Possession, Section 132 at 835, 836.

The chancellor then ruled as follows: "Inasmuch as this was a family relationship and the proof shows that G.M. Tanner did not apprise the plaintiffs of his claim of title until 1973 the defendants' claim of title by twenty years adverse possession must fail."

The equitable rule that the chancellor applied has a kinship with the doctrine of constructive trusts, to wit, that both are predicated on the existence of a relationship that makes it repugnant for the party in the position of trustee to obtain any advantage for himself to the detriment of the cestui que trust.

G.M. Tanner was under a court order to pay Ruth Tanner's attorney's fees, to build a house on the 213 acre tract and to fence the property and "furnish materials" to an extent not ascertainable in this record. While he was performing those legal obligations, and for the remainder of his life, his first family permitted him to use the property and keep all of the net proceeds therefrom for the benefit of himself and his second family.

Under the doctrine of constructive trusts, it is not necessary to prove actual fraud and it is immaterial what G.M. Tanner's intentions were when he paid Ruth's attorneys fees, when he obtained the deed to a one-half interest from his brother or when he paid the taxes. He was under a court ordered duty to pay the fees, build the house and fence the property and under a legal and equitable duty as grantor of the land and father of the plaintiffs to honor their legal title to the property. We hold that under the circumstances of this case

equity will construct a trust to satisfy the demands of justice; that G.M. Tanner, as a permissive user of his children's property assumed a position of confidence and trust that prevented him from acquiring any title or interest in the property adverse to plaintiffs, to the beneficiaries of the trust. In short, G.M. Tanner, as trustee of the constructive trust could not take any action adverse to the title of his beneficiaries including the open declaration that he intended to hold adversely to them, whenever made in the 1970's. Such action was as void as the surreptituous deed of a one-half interest his brother purported to convey to him in 1961, having no interest whatever in the property at that time.

One member of the Court of Appeals' panel filed a concurring opinion, expressing concern about the harsh result reached by the court's decision, but cited *Burress v. Woodward,* 665 S.W.2d 707 (Tenn.1984) as requiring that result. We think this case is clearly distinguishable from *Burress.* There, plaintiffs were the heirs of one Williams who had sold his property to defendant Woodward, but specifically retained the mineral rights. Plaintiffs sought to enforce their mineral rights against Woodward who pled the bar of T.C.A. section 28–2–110, failure to pay taxes for a period of twenty years. The proof was that there had never been an assessment of the mineral interests put upon the tax rolls and no one, neither plaintiffs nor defendants, had paid taxes on the mineral rights. Under those circumstances the bar of the statute was imposed. In the instant case the taxes have been assessed and paid by G.M. Tanner, as trustee, for the use and benefit of the plaintiffs and neither he nor his successors in interest may invoke the bar of T.C.A. section 28–2–110 to the detriment of the beneficiaries of the constructive trust.

It also follows that neither G.M. Tanner nor his successors may invoke the bar of T.C.A. sections 28–2–102 or 28–2–103.

The judgments of the trial court and the Court of Appeals are reversed and this case is remanded to the Chancery Court of Cumberland County for the entry of a decree declaring that the plaintiffs are the owners in fee simple of the 213 acres of land conveyed to their mother, Ruth Tanner by warranty deed of record in Book 41, Pages 541–542, executed by Glenn M. Tanner and Roscoe (Bud) Tanner as grantors on the twenty-eighth day of October 1950, and recorded on that same date, and removing the cloud on their title by adjudging as null and void a deed executed by Roscoe (Bud) Tanner and wife Elizabeth Tanner as grantors to G.M. Tanner, as grantee, dated September 2, 1961, and recorded on the ninth day of September, 1961, in the Registrar's Office of Cumberland County, noted in Note Book "I", page 361 and recorded on September 13, 1961, Book 58, pages 168–170, and declaring null and void a deed executed by G.M. Tanner and Morine Tanner as grantors to James H. Tanner and Randall Keith Tanner as grantees, dated June 30, 1980, and recorded in Book 226, Page 688, on June 30, 1980.

Costs of this case are adjudged against defendants.

COOPER, C.J., and BROCK, HARBISON and DROWOTA, JJ., concur.