FILED

04/10/2018

Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
March 28, 2018 Session

## LASCASSAS LAND COMPANY, LLC v. JIMMY E. ALLEN, ET AL.

**Appeal from the Chancery Court for Rutherford County**
**No. 15CV-1008      Hamilton V. Gayden, Jr., Judge**

_____

### No. M2017-01400-COA-R3-CV

_____

This appeal involves a dispute between two limited liability companies (and an individual with an interest in both companies) over four lots in a residential subdivision. After a two-day bench trial, the trial court awarded the plaintiff-company $116,151.87 in proceeds from the sale of lots that were originally owned by the plaintiff. However, the trial court ruled that the defendant-company was entitled to recover $512,795.07 for the amount it expended constructing homes on those lots. The plaintiff-company has appealed, challenging numerous rulings made by the trial court. For the following reasons, we affirm in part, reverse in part, and remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in part, Reversed in part and Remanded**

BRANDON O. GIBSON, J., delivered the opinion of the court, in which ARNOLD B. GOLDIN, and KENNY ARMSTRONG, JJ., joined.

Matthew Robert Zenner and Malcolm Leonard McCune, Brentwood, Tennessee, for the appellant, Lascassas Land Company, LLC.

Terry A. Fann, Murfreesboro, Tennessee, for the appellee, A & R. Land Investments, LLC.

Gilbert Wayne McCarter, II, Murfreesboro, Tennessee, for the appellee, Jimmy E. Allen.

## OPINION

### I. FACTS & PROCEDURAL HISTORY

Lascassas Land Company, LLC, was formed in 2000 to own and develop real estate lots in Farmington Subdivision in Murfreesboro, Tennessee. The subdivision was

originally platted for 183 lots. By 2015, Lascassas had only four of those subdivision lots remaining for sale, and Lascassas also owned one 14-acre parcel of property. Lascassas had only one debt – a promissory note to a local bank with a remaining balance of approximately $23,600. The three members of the LLC, at this time, were Percy Dempsey, Joseph Boone, and Jimmy Allen. The relationship among the three members had deteriorated to the point that they were involved in several lawsuits regarding other matters and business entities.

Percy Dempsey served as the chief manager or managing member of Lascassas, and he was the only member with general authorization to execute deeds and other instruments pertaining to the business of the LLC. Dempsey and his administrative assistant handled the accounting work for Lascassas. In June 2014, the aforementioned promissory note matured, and Lascassas stopped receiving monthly statements from the local bank regarding the promissory note. Dempsey contacted the bank to inquire about the status of the note and learned that Jimmy Allen had purchased the note from the bank for roughly $23,800.[1] However, Allen never contacted Dempsey or Boone to inform them that he had purchased the note or to discuss payment terms.

In mid-May 2015, Dempsey arranged for someone to mow the grass on the four vacant subdivision lots owned by Lascassas. Shortly thereafter, the individual contacted Dempsey and informed him that houses were being constructed on two of the four lots. Dempsey contacted the attorney who Lascassas used for real estate closings, and upon investigation, he discovered that the four lots had recently been conveyed by quitclaim deed, on April 16, 2015. The quitclaim deed purportedly conveyed the four lots from Lascassas to A&R Land Investments, LLC. Allen had signed the quitclaim deed on behalf of the grantor, Lascassas. Allen was also one-half owner of the grantee, A&R Land Investments, LLC.

Lascassas instituted the present litigation on July 10, 2015, with the filing of a complaint against Allen and A&R. The complaint alleged that Allen had conveyed the four lots to A&R without the knowledge or authorization of Lascassas. The complaint alleged that Allen breached his fiduciary duties to Lascassas and converted the lots to the detriment of Lascassas. It asked the trial court to declare the quitclaim deed null and void, or in the alternative, to grant Lascassas a judgment for the value of the lots. Lascassas also sought an award of punitive damages. In addition, Lascassas filed notice of a lien lis pendens claiming rightful ownership of the four lots.[2]

---

[1] During his deposition, Allen testified that he had to satisfy the promissory note in order to remain a board member at the bank due to an impending merger. He said, "One of the criteria was that had to be satisfied before I could be approved."

[2] "An abstract of lien lis pendens ('suit pending') is a notice filed in the register's office in the county of suit to warn all persons that the title to the property is at issue in the litigation." *Neal v. Barone*, No.

2

When the complaint was filed on July 10, 2015, the two homes being constructed by A&R were nearly sixty percent complete. A&R proceeded with construction despite the filing of the complaint and the lien lis pendens. A&R filed a motion to release the lien lis pendens in order to enable it to place the homes on the market for sale unencumbered. Lascassas opposed the motion and also filed an amended complaint seeking the imposition of a constructive trust over the properties and any profits derived from them.

While the litigation was pending, the parties agreed to obtain an appraisal of the four lots. Lots 99 and 100, which remained vacant and needed significant site work, were valued at $25,000 each. Lots 109 and 110 were valued at $48,000 each.

The parties attended mediation and reached a partial settlement agreement. An agreed order was entered on May 13, 2016. It provided that A&R would convey the two vacant lots, Lots 99 and 100, back to Lascassas. The agreed order further provided:

> Lots 109 and 110 have been improved by the construction of homes. There are contracts for the sale of these homes, which are to close at the end of May 2016 if [Lascassas] will release their Lien Lis Pendens. Therefore, [Lascassas] agree[s] to release the Lien Lis Pendens upon being presented with a Good Faith Estimate of Closing Cost, which they approve, on the condition that all proceeds that exceed the approved Good Faith Estimate are paid by the closing agent into this court.
>
> . . . .
>
> [] The parties will then have the right to litigate all issues that are a subject to [sic] this lawsuit and these proceeds at a later time.

After the filing of this agreed order, A&R tendered the proceeds from the sales of the homes to the clerk of the court. Lot 109 sold for $331,000, and Lot 110 sold for $357,900. The net proceeds from the sale of Lot 109 totaled $312,949.56, and the net proceeds from the sale of Lot 110 totaled $339,667.95. Thus, a total of $652,617.51 was deposited with the clerk.

A&R then filed a motion for payment of its construction expenses. According to A&R, the only amounts deducted from the sale proceeds prior to the tender to the clerk were for real estate commissions and closing costs. A&R asserted that it spent $242,816.52 constructing the house on Lot 109 and $269,978.55 constructing the house on Lot 110. Accordingly, A&R sought an order directing the clerk to pay A&R a total of $512,795.07 for its construction costs from the sale proceeds.

E2009-02598-COA-R9-CV, 2010 WL 4024973, at *1 n.2 (Tenn. Ct. App. Oct. 13, 2010).

Lascassas filed a response to the motion for payment of construction costs asserting that it was the rightful owner of the lots on which the homes were constructed and the sale proceeds. Lascassas noted that A&R had not asserted any type of legal claim as the basis for its motion for reimbursement of its construction costs. Lascassas argued that A&R's only conceivable claim would be one for an equitable remedy such as unjust enrichment, and Lascassas argued that A&R would be barred from such an equitable remedy in light of its unclean hands.

A&R then filed a motion to amend its answer and to assert a counterclaim for unjust enrichment. The motion was granted, and A&R filed a counterclaim asserting that Lascassas would be unjustly enriched if it was permitted to retain all of the proceeds from the sales of the homes without paying A&R for the costs of construction. A&R sought a judgment against Lascassas for the costs of construction. Lascassas filed an answer to the counterclaim, maintaining that the unauthorized quitclaim deed to A&R was void and that A&R constructed the homes at its own peril, with full knowledge that it was not the rightful owner of the lots and in the position of a trespasser. Lascassas asserted that A&R was barred from the equitable remedy of unjust enrichment under the doctrine of unclean hands.

The trial court held a two-day bench trial in February 2017. The only three witnesses to testify at trial were Percy Dempsey and Joseph Boone, as members of Lascassas, and Ryan Church, the other one-half owner of A&R. The deposition of Jimmy Allen was entered as an exhibit. During his deposition, Allen testified that when he purchased the promissory note for the debt Lascassas owed to the local bank, "in [his] mind," that entitled him to "ownership" of the four lots owned by Lascassas.[3] Allen's attorney had prepared the quitclaim deed conveying the lots to A&R in accordance with Allen's representation to his attorney that he had authority to convey the lots for or on behalf of Lascassas. Allen acknowledged that no money changed hands when he executed the quitclaim deed conveying the four lots from Lascassas to A&R. However, Allen and the other owner of A&R, Ryan Church, had discussed a price for the four lots and agreed that A&R would pay $105,000 *to Allen*. Allen testified that this sum was "owed to me" by A&R because he was the one who contributed the lots. Allen testified that the intent was for A&R to "keep the profits." When asked what Lascassas got out of the deal, Allen responded, "They didn't take anything because I bought the note, and that's what - - that's what produced the quitclaim." Allen later suggested that Lascassas did benefit from the transaction in the sense that it was no longer obligated to the bank for the amount of the promissory note. Counsel for Lascassas asked Allen to clarify whether he took ownership of lots that he himself valued at $105,000 in exchange for

---

[3]The original promissory note owed to the bank was entered as an exhibit at trial, and it described the collateral as "real property known as Lots 92, 110, 112 and 119 Farmington." The four lots at issue in this litigation were Lots 99, 100, 109, and 110.

purchasing a promissory note valued at much less, to which Allen responded, "if they would have asked me, I would have been glad to pay them the difference between the value and the note."

Ryan Church, the other member of A&R, similarly testified at trial that there were "no payments made whatsoever" as a result of the quitclaim deed transferring the four lots from Lascassas to A&R. Church testified that after the execution of the quitclaim deed, he made a notation "on the books" of A&R that $105,000 was due *to Allen*. Church testified that A&R had been involved with constructing homes on three other lots in Farmington subdivision, and in each of the three previous instances, A&R paid Allen for the value of the lots after the homes were constructed and sold.[4] Church testified that when Allen approached him about developing the lots at issue in this litigation, he followed the same process, at least from his perspective. Allen told him that he "had lots available" for development, and they agreed to begin construction on two of them. Church entered on the books a payable to Allen for each of the lots. He testified that he and Allen agreed on a price of $35,000 for each of the two lots they decided to develop and $17,500 for each of the lots that remained vacant. Church confirmed that once the two houses were sold, "$70,000 would go in the pocket of Jimmy Allen to repay him for the lots[.]" In other words, Church said that A&R intended to pay for the lots, but the person it intended to pay was Allen. Any profit remaining after the sale would be split between Church and Allen.

Church testified that he did not look at the deeds or attend the closings. When he learned about the lawsuit filed by Lascassas, he discussed the situation with Allen, and Allen told him that he was entitled to do what he did with the lots because he "bought a note" from the local bank and was owed money. Church accepted Allen's explanation and did not attempt to verify whether he was authorized to convey the lots on behalf of Lascassas. Church said he had no communication with Lascassas and did not obtain permission to continue building the houses after receiving notice of the lawsuit.

Dempsey and Boone testified about their roles with Lascassas and their dealings with Allen. They acknowledged the litigation and financial problems surrounding other business entities of which the three men were members. However, Dempsey, the managing member of Lascassas, testified that Lascassas was well capitalized and had more than sufficient assets to satisfy its only remaining debt of approximately $23,600. Dempsey discussed various provisions of the operating agreement of Lascassas to demonstrate that Allen was not authorized to convey the lots owned by Lascassas. Dempsey conceded that Lascassas suffered no damages as a result of the conveyance of Lots 99 and 100 because those lots were reconveyed to Lascassas. As for Lots 109 and

---

[4]Only one of the three lots previously developed by A&R was conveyed by a deed directly from Lascassas to A&R. That deed was signed by Dempsey on behalf of Lascassas as its managing member.

5

110, however, Dempsey said, "We believe that we're entitled to the proceeds from the sale of our property, period."

The trial court entered its final order on June 23, 2017. The court made numerous factual findings at the outset. The trial court found that Allen quitclaimed the four Farmington subdivision lots from Lascassas to A&R, signing the deed purportedly as a representative of the grantor, Lascassas. The trial court found that no vote was conducted by the members of Lascassas and that "Allen had no authority to sign the Quitclaim deed on behalf of Lascassas." The trial court further found that Allen understood, at the time he executed the quitclaim deed, that only the chief manager, Dempsey, had authority to execute deeds on behalf of Lascassas. The court found that Allen did not give Dempsey or Boone notice that he intended to transfer the lots and that the deed purporting to convey the four lots "was made without the knowledge of Lascassas or its other members." At the same time, however, the trial court found that "[d]ue to pre[viou]s dealings be[t]ween the entities, it was understood [b]etween Lascassas and A&R that paym[e]nt for the lots would be made [wh]en construc[tion] was completed and [the] homes sold." The trial court found that the transaction "was recorded as a $105,000 payable *to Allen* on A&R's books." (Emphasis added.) The court found that "[t]he intent of the transaction was that A&R would build on the lots and Church and Allen, as the members of A&R, would split the profits."

In the section of the order entitled "Conclusions of Law," the trial court first found that the quitclaim deed executed by Allen "was a valid transfer of title to A&R."[5] As such, the court concluded that the titles to Lots 109 and 110 were validly transferred to the new owners of the properties, and Lots 99 and 100 were transferred back to Lascassas.

Next, the trial court found that "Allen breached no fiduciary duty because no meaningful fiduciary relationship existed between the members of Lascassas at the time of the transfer." The trial court quoted Tennessee Code Annotated section 48-240-102(a)-(b), which states:

> (a) Fiduciary Duty of Members of Member-Managed LLC. Except as provided in the articles or operating agreement, every member of a member-managed LLC must account to the LLC for any benefit, and hold as trustee for it any profits derived by the member without the consent of the other members from any transaction connected with the formation,

[5]The trial court also found that the last four lots owned by Lascassas "secured the one remaining debt of Lascassas, the note payable to Jimmy Allen." This finding is not consistent with the description of the collateral on the promissory note itself. But in any event, the trial court concluded that "[t]itle was foreclosed outside of the deed of trust and did not pass by way of foreclosure."

6

conduct, or liquidation of the LLC or from any use by the member of its property including, but not limited to, confidential or proprietary information of the LLC or other matters entrusted to the member as a result of such person's status as a member.

(b) Standard of Conduct. A member of a member-managed LLC shall discharge such member's duties as a member, including all duties as a member of a committee:

(1) In good faith;

(2) With the care an ordinarily prudent person in a like position would exercise under similar circumstances; and

(3) In a manner the member reasonably believes to be in the best interest of the LLC.

With regard to this statute, the trial court found that "Allen's actions were in good faith, were done with the care of an ordinarily prudent person in similar circumstances, and were in the best interest of the LLC and in line with previous actions of the LLCs involved." As a result, the court concluded that Allen breached no fiduciary duty to Lascassas. Again, however, the court added that "the members' fiduciary duty to one another – if there was one at some time – had been effectively destroyed by their failure to act in the best interest of the LLC."

The trial court also considered but rejected the request by Lascassas for a constructive trust. The trial court found no basis for imposing a constructive trust because "Allen's actions were not done with the intent to defraud, but were rather in the best interest of Lascassas," and did not breach any fiduciary duty owed to Lascassas. The trial court dismissed the claim for punitive damages, concluding that the actions of Allen and A&R did not rise to the level necessary for the imposition of punitive damages or "shock the conscience."

In summary, the trial court explained its ultimate decision and award of damages as follows:

16. Upon consideration of the proof, the Court finds that this is a *de jure* derivative action brought by Percy Dempsey on behalf of Lascassas Land Company, LLC.

17. The Court finds that the Plaintiff's request for a total amount of

$652,617.51 is untenable and inequitable in this case. However, Lascassas is entitled to damages based upon the efforts of Percy Dempsey as Managing Director of Lascassas in filing this action.

18. The Court finds the following damages to be proper and equitable considering the proof:

> A&R will be awarded its constructions costs of the single-family homes built upon Lots 109 and 110 in the amount of $512,795.07, payable to A&R . . . .

> Lascassas has suffered no damages to the transfer of Lots 99 and 100 to A&R and the subsequent transfer back to L[a]scassas f[ol]lowing mediation.

> Jimmy Allen is awarded $23,670.57, which represents the amount he paid for the promissory note held by [the] Bank.

> Lascassas is awarded the balance held by the Clerk of $116,151.87.

Lascassas timely filed a notice of appeal to this Court.

## II. ISSUES PRESENTED

On appeal, Lascassas presents the following issues, which we have restated slightly, for review on appeal:

1.      Did the trial court err in ruling that the quitclaim deed executed by Allen was a valid transfer of title to A&R rather than a voidable transaction;

2.      Did the trial court err in finding that Allen did not breach his fiduciary duty to Lascassas by engaging in an undisclosed self-dealing transaction;

3.      Did the trial court err in failing impose a constructive trust in favor of Lascassas on the proceeds from the sale of Lots 109 and 110;

4.      Did the trial court err in dismissing the claim for punitive damages against Allen;

5.      Did the trial court err in awarding $512,795.07 to A&R for its construction costs;

6.      Did the trial court err in awarding $23,670.57 to Allen, representing the amount he paid for the promissory note, when Allen never asserted a counterclaim.

For the following reasons, we affirm in part, reverse in part, and remand for further proceedings.

### III. STANDARD OF REVIEW

"When reviewing a trial court's findings following a bench trial, this Court reviews the record *de novo* and presumes that the trial court's findings of fact are correct unless the preponderance of the evidence is otherwise." *M & M Elec. Contractor, Inc. v. Cumberland Elec. Membership Corp.*, 529 S.W.3d 413, 422 (Tenn. Ct. App. 2016) (citing *Nashville Ford Tractor, Inc. v. Great Am. Ins. Co.*, 194 S.W.3d 415, 424 (Tenn. Ct. App. 2005)). However, we review a trial court's legal conclusions without a presumption of correctness. *Id.*

### IV. DISCUSSION

#### A.      *Breach of Fiduciary Duty and the Limited Liability Company Act*

We find it appropriate to begin with the issue of whether Allen breached his fiduciary duty to Lascassas by conveying the four lots to A&R. This issue requires us to examine the Tennessee Limited Liability Company Act, Tennessee Code Annotated section 48-201-101, et seq.[6]

It is important to note, at the outset, that a member of an LLC "has no interest in specific LLC property." Tenn. Code Ann. § 48-215-101(a). Rather, "[a]ll property transferred to or acquired by an LLC is property of the LLC itself." *Id.* The LLC has an existence separate from its members and managers. *Collier v. Greenbrier Developers,*

---

[6]We note that the Tennessee Revised Limited Liability Company Act, Tenn. Code Ann. § 48-249-101, et seq., "made extensive revisions to the operation of LLCs in Tennessee and became effective on January 1, 2006." *Bridgeforth v. Jones*, No. M2013-01500-COA-R3-CV, 2015 WL 336376, at *24 n.18 (Tenn. Ct. App. Jan. 26, 2015). The revised Act applies to all LLCs formed after January 1, 2006, and to LLCs formed prior to that date if they expressly choose to be governed by the revised Act. *Id.* (citing Tenn. Code Ann. § 48-249-1002(b)). Lascassas Land Company, LLC, was formed in 2000, and there is nothing in the record to indicate that it has expressly elected to be governed by the revised Act. The parties rely on provisions of the original LLC Act in their briefs on appeal. Accordingly, we have applied the original LLC Act in this opinion.

*LLC*, 358 S.W.3d 195, 200 (Tenn. Ct. App. 2009). Tennessee Code Annotated section 48-238-103 addresses the issue of agency for members in a member-managed LLC:

> (a) Unless the articles otherwise provide, if an LLC is member-managed, every member is an agent of the LLC for the purpose of its business, and the act of every member, including the execution in the LLC name of any instrument, for apparently carrying on in the usual way the business of the LLC of which such member is a member, binds the LLC, *unless* the member so acting has in fact no authority to act for the LLC in the particular matter, and the person with whom the member is dealing has knowledge of the fact that the member has no such authority.

(Emphasis added.) Although the trial court in this case did not mention this statute, the court made several findings that aid us in applying it. After discussing the Lascassas operating agreement in depth, the trial court concluded that "Allen had no authority to sign the Quitclaim deed on behalf of Lascassas." The trial court further found, "At the time he executed the Quitclaim Deed from Lascassas to A&R, Allen understood that only the Chief Manager (Dempsey) had authority to execute deeds on behalf of Lascassas[.]" These findings are amply supported by the record. Pursuant to the aforementioned statute, the action of a member is not binding on the LLC if "the member so acting has in fact no authority to act for the LLC in the particular matter, and the person with whom the member is dealing has knowledge of the fact that the member has no such authority." *Id.* Allen did not in fact have authority to act for the LLC in the particular matter at issue, and because Allen was simultaneously acting as the agent for A&R in the transaction, A&R necessarily had knowledge of the fact that the transacting member of Lascassas had no authority. As a result, Allen's unauthorized actions did not bind the LLC under the circumstances of this case.

The LLC Act also addresses the fiduciary duty owed by members of an LLC and the standard of conduct that applies to the discharge of the members' duties:

> (a) Fiduciary Duty of Members of Member-Managed LLC. Except as provided in the articles or operating agreement, every member of a member-managed LLC must account to the LLC for any benefit, and hold as trustee for it any profits derived by the member without the consent of the other members from any transaction connected with the formation, conduct, or liquidation of the LLC or from any use by the member of its property including, but not limited to, confidential or proprietary information of the LLC or other matters entrusted to the member as a result of such person's status as a member.

10

(b) Standard of Conduct. A member of a member-managed LLC shall discharge such member's duties as a member, including all duties as a member of a committee:

(1) In good faith;

(2) With the care an ordinarily prudent person in a like position would exercise under similar circumstances; and

(3) In a manner the member reasonably believes to be in the best interest of the LLC.

Tenn. Code Ann. § 48-240-102. Quoting this statute in its final order, the trial court found that "Allen breached no fiduciary duty because no meaningful fiduciary relationship existed between the members of Lascassas at the time of the transfer." Noting that the three men were involved in a myriad of lawsuits, the trial court concluded that they "lacked any semblance of a fiduciary, trusting relationship." It concluded that "the members' fiduciary duty to one another -- if there was one at some time -- had been effectively destroyed by their failure to act in the best interest of the LLC." In sum, the trial court found that "no fiduciary relationship existed at the time of the transfer due to the history and nature of the parties' interactions prior to the transfer."

The trial court cited no authority for its conclusion that the fiduciary duty the LLC members owed to the LLC could be extinguished by the members' conduct or disagreements, and we have found none. Tennessee Code Annotated section 48-240-102(a) provides for a "statutory fiduciary duty." *Raleigh Commons, Inc. v. SWH, LLC*, No. W2011-01298-COA-R3-CV, 2013 WL 3329016, at *20 n.6 (Tenn. Ct. App. June 28, 2013). "The statute in question defines the fiduciary duty of members of a member-managed LLC as one owing to the LLC, not to individual members."[7] *McGee v. Best*, 106 S.W.3d 48, 64 (Tenn. Ct. App. 2002). Specifically, Tennessee Code Annotated section 48-240-102(a) provides that a member of a member-managed LLC has a fiduciary duty to "'account *to the LLC* for any benefit, and hold as trustee for it any profits derived by the member without the consent of the other members from any transaction connected with the . . . conduct . . . of the LLC." *Commissioners of Powell-Clinch Util. Dist. v. Util. Mgmt. Review Bd.*, 427 S.W.3d 375, 388 (Tenn. Ct. App. 2013)

---

[7]We note that under the revised LLC Act, mentioned above, "members of a member-managed LLC do owe fiduciary duties to each other, specifically the duties of loyalty and care." *Bridgeforth*, 2015 WL 336376, at *26 (citing Tenn. Code Ann. § 48-249-403(a)-(c)). This Court has also recognized that "a majority shareholder of an LLC stands in a fiduciary relationship to the minority[.]" *Anderson v. Wilder*, No. E2003-00460-COA-R3-CV, 2003 WL 22768666, at *6 (Tenn. Ct. App. Nov. 21, 2003). However, the revised Act does not apply to Lascassas, and this case does not involve a majority shareholder.

(quoting Tenn. Code Ann. § 48-240-102(a)). Allen breached this fiduciary duty by conveying the four lots owned by Lascassas to another LLC, of which he owned one-half, for no consideration, without notice to the other members of Lascassas, and with full knowledge of the fact that he lacked authority to execute the deed on behalf of Lascassas.

We simply cannot agree with the trial court's conclusion that "Allen's actions were in good faith, were done with the care of an ordinarily prudent person in similar circumstances, and were in the best interest of the LLC and in line with previous actions of the LLCs involved." The trial court made specific factual findings that do not support these conclusions. The court found that Allen had attempted to purchase the same four lots from Lascassas less than a year earlier, through another LLC, without informing the other members of Lascassas that he was a member of the LLC proposing to buy the lots. Allen admitted that he did not inform Dempsey or Boone of his one-half interest in that LLC because he thought they would not agree to the sale if they knew of his involvement.

The trial court found that Allen later executed the quitclaim deed conveying the lots to A&R, signing the deed as a representative of Lascassas, even though he knew that only the chief manager, Dempsey, had authority to execute deeds on behalf of Lascassas. The trial court found that "Allen had no authority to sign the Quitclaim deed on behalf of Lascassas." It found that the "intent of the transaction was that A&R would build on the lots and Church and Allen, as the members of A&R, would split the profits." The court found that Allen did not give Dempsey or Boone notice that he intended to transfer the lots and that the deed purporting to convey the four lots "was made without the knowledge of Lascassas or its other members." However, the trial court found that "[d]ue to pre[viou]s dealings be[t]ween the entities, it was understood [b]etween Lascassas and A&R that paym[e]nt for the lots would be made [wh]en construc[tion] was completed and [the] homes sold." We simply cannot determine how "it was understood [b]etween Lascassas and A&R" that payment for the lots would be made upon completion of construction when the conveyance was made "without the knowledge of Lascassas or its other members." More importantly, the trial testimony established that A&R intended to pay *Allen* upon completion of construction, not Lascassas. Church confirmed this at the conclusion of his testimony:

> Q. To be clear, A&R intended to pay for these lots, but the person they intended to pay was Jimmy Allen?
>
> A. Correct.

As the trial court correctly noted, the transaction was recorded on the books of A&R "as a $105,000 payable *to Allen*." (Emphasis added.) Allen never testified that he intended to

pay that $105,000 to Lascassas. To the contrary, Allen testified that, in his mind, he was entitled to "ownership" of the four lots because he had purchased the promissory note. He testified that he and Church agreed to a purchase price of $105,000, and that this amount was "owed to me." The following exchange occurred during his deposition:

Q. And at that point, because you were the one that contributed it, in your mind A&R owed you $105,000, correct?

A. Yes.

Q. What did Lascassas take out of this?

A. *They didn't take anything* because I bought the note, and that's what – that's what produced the quitclaim.

(Emphasis added.) Allen later testified that Lascassas benefitted in the sense that it no longer owed any money *to the bank*. He also suggested, when pressed, that he "would have been glad to pay [Lascassas] the difference" between the value of the four lots and the promissory note "*if they would have asked me*." (Emphasis added.) However, this testimony confirms that Allen had no intention of unilaterally paying Lascassas for the value of the lots or accounting to the LLC for the benefit he received. Having concluded that Allen breached his fiduciary duty to Lascassas and that the unauthorized transaction was not binding on Lascassas, we turn now to the appropriate remedy.

### B. *Available Remedies*

The LLC Act specifically addresses ultra vires acts and how the validity of an LLC's action may be challenged on the ground that the LLC lacked the power to act:

(a) Limit on Power to Challenge. Except as provided in subsection (b), the validity of an LLC's action may not be challenged on the ground that the LLC lacks or lacked the power to act.

(b) Challenge of Power. An LLC's power to act may be challenged in a proceeding by:

(1) A member against the LLC to enjoin the act;

(2) *The LLC*, directly, derivatively, or through a receiver, trustee, or other legal representative, against an incumbent or former governor (if board-managed), manager, employee, or agent of the LLC; or

13

(3) The attorney general and reporter under § 48-245-902.

Tenn. Code Ann. § 48-213-101 (emphasis added). Here, Lascassas filed this lawsuit seeking to have the quitclaim deed executed by Allen, purportedly on behalf of Lascassas, declared null and void, or in the alternative, seeking a judgment against Allen and A&R for the value of the lots. Through amended complaints, Lascassas also requested the imposition of a constructive trust over the wrongfully transferred property and all profits derived from the property. Lascassas also filed a notice of lien lis pendens.

During the litigation, however, the parties attended mediation and reached a partial settlement agreement. Pursuant to an agreed order, A&R conveyed the two vacant lots back to Lascassas, and Lascassas agreed to release its lien lis pendens to allow the other two lots, containing homes constructed by A&R, to be sold to homeowners, on the condition that the proceeds would be deposited with the court. The agreed order provided that the parties would have the right to litigate "all issues" at a later date. Despite these conveyances, on appeal, Lascassas maintains that the quitclaim deed from Lascassas to A&R should be found void or voidable.

At oral argument before this Court, counsel for Lascassas was questioned as to why it continues to seek a ruling from this Court finding the quitclaim deed void when two of the lots have already been conveyed from A&R back to Lascassas, and the other two lots were conveyed from A&R to third party homebuyers. Lascassas conceded that it was not damaged by the conveyance and return of the two vacant lots. Lascassas also conceded that the homeowners were bona fide purchasers of the properties and that it had no desire to impact the valid transfers of title to those homeowners. Instead, Lascassas asked this Court to find the quitclaim deed void "as between us," meaning, the parties to this litigation. Lascassas suggested that the parties to this litigation could continue to dispute the propriety of the transaction in spite of the agreed order. According to Lascassas, declaring the quitclaim deed void would mean that Lascassas owned the lots at the time of transfer and was entitled to the proceeds from the sale of the two lots.

While we agree that the parties can continue to litigate the propriety of the conveyance in this appeal, we disagree with the suggestion that it would be necessary or appropriate to declare the quitclaim deed void under the circumstances of this case. In our view, Lascassas waived any right to have the quitclaim deed declared null and void by entering into the agreed order removing its lien lis pendens and allowing A&R to convey two of the lots back to Lascassas and two of the lots to homeowners on the condition that the proceeds would be tendered to the clerk. However, this does not mean that Lascassas is left without a remedy. It also sought the imposition of a constructive trust on the wrongfully transferred properties and/or the proceeds from the sales of those

14

properties. We now examine that issue.

A constructive trust is an equitable remedy implied by law from the acts and conduct of the parties and the facts and circumstances surrounding the transaction out of which it arises. *Bank of Nashville v. Chipman*, No. M2010-01581-COA-R3-CV, 2011 WL 3433012, at *7 (Tenn. Ct. App. Aug. 5, 2011) (citing *Story v. Lanier*, 166 S.W.3d 167, 184 (Tenn. Ct. App. 2004)). Constructive trusts are so called because they are constructed in order to satisfy the demands of justice. *Tanner v. Tanner*, 698 S.W.2d 342, 345 (Tenn. 1985).

> "A constructive trust is one that arises contrary to intention . . . against one who by fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, or by any form of unconscionable conduct, artifice, concealment, or questionable means, or who in any way against equity and good conscience, either has obtained or holds the legal title to property which he ought not, in equity and good conscience hold and enjoy."

*Logan v. Estate of Cannon*, No. E2015-02254-COA-R3-CV, 2016 WL 5344526, at *15 (Tenn. Ct. App. Sept. 23, 2016) (quoting *Livesay v. Keaton*, 611 S.W.2d 581, 584 (Tenn. Ct. App. 1980)). "Under the doctrine of constructive trusts, it is not necessary to prove actual fraud[.]" *Tanner*, 698 S.W.2d at 346. "'When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest[,] equity converts him into a trustee.'" *Holt v. Holt*, 995 S.W.2d 68, 71 (Tenn. 1999) (quoting *Beatty v. Guggenheim Exploration Co.*, 225 N.Y. 380, 122 N.E. 378, 380-81 (1919)).

> [A] constructive trust may be imposed where, for example, a person (1) obtains legal title to property in violation of some duty owed the owner of the property; (2) obtains title to property by fraud, duress, or other inequitable means; (3) makes use of a confidential relationship or undue influence to obtain title to property upon more advantageous terms than would otherwise have been obtained; or (4) obtains property with notice that someone else is entitled to the property's benefits.

*Stewart v. Sewell*, 215 S.W.3d 815, 826 (Tenn. 2007). The plaintiff bears the burden of establishing the existence of a constructive trust by clear and convincing evidence. *Bank of Nashville*, 2011 WL 3433012, at *7.

The case before us implicates two of the examples listed above. A&R obtained legal title to property as a result of its agent's violation of his fiduciary duty to Lascassas and through inequitable means, paying no compensation to Lascassas for the lots.

Thereafter, A&R held legal title to the properties, but it "ought not, in equity and good conscience" retain the beneficial interest. *Logan*, 2016 WL 5344526, at *15. The trial court considered the request by Lascasssas for imposition of a constructive trust but rejected its request with the following explanation:

> The Court finds that because Jimmy Allen's actions were not done with the intent to defraud, but were rather in the best interest of Lascassas, imposition of a constructive trust is improper. As already noted, Jimmy Allen breached no fiduciary duty to Lascassas, and no meaningful fiduciary duty existed between its members, therefore, there is no basis in this case for the imposition of a constructive trust.

Contrary to the trial court's findings, Allen did breach the fiduciary duty he owed to Lascassas. We conclude that his actions were sufficiently wrongful to support the imposition of a constructive trust over some if not all of the proceeds from the sale of the two lots deposited with the clerk.

The reach of the constructive trust is another matter. "A court of equity in decreeing a constructive trust is bound by no unyielding formula. The equity of the transaction must shape the measure of relief." *Holt*, 995 S.W.2d at 71 (quotation omitted). On appeal, Lascassas argues that the trial court erred in awarding A&R $512,795.07 from the sale proceeds, which totaled $652,617.51, to reimburse A&R for its construction costs. Lascassas maintains that it should have received *all* proceeds from the sales of the wrongfully transferred properties. In response, A&R argues that "[e]nacting a constructive trust to the benefit of [Lascassas] over the entire proceeds of the sales without reimbursing Appellee A&R its construction costs would unjustly enrich [Lascassas] to the detriment of Appellee A&R, and it would be most inequitable." Analyzing the elements of an unjust enrichment claim, A&R argues that it conferred a benefit on Lascassas, that Lascassas appreciated the benefit, and that Lascassas accepted the benefit under such circumstances that equity does not allow it to maintain the benefit without payment to A&R. *See Bennett v. Visa U.S.A., Inc.*, 198 S.W.3d 747, 755 (Tenn. Ct. App. 2006). In response to that argument, Lascassas insists that A&R is barred from recovering under the equitable remedy of unjust enrichment because it had unclean hands in the transaction at issue. *See Hogue v. Kroger Co.*, 373 S.W.2d 714, 716 (Tenn. 1963) ("[A] complainant, who has been guilty of unconscientious conduct or bad faith, or has committed any wrong, in reference to a particular transaction, cannot have the aid of a Court of Equity in enforcing any alleged rights growing out of such transaction.") (quotation omitted); *SKS Commc'ns, Inc. v. Globe Commc'ns, Inc.*, No. 03A01-9405-CH-00176, 1994 WL 589576, at *5 (Tenn. Ct. App. Oct. 21, 1994) ("Because unjust enrichment is an *equitable* remedy, [] a party seeking it must come with clean hands.") (quotation omitted).

16

These were the same arguments raised in the proceedings before the trial court. A&R asserted a counterclaim for its construction costs on the basis of unjust enrichment, and Lascassas in its answer asserted the defense of unclean hands. Unfortunately, the trial court did not discuss or analyze the elements of an unjust enrichment claim or the defense of unclean hands in its order. Although the trial court made extensive findings regarding the issues of fiduciary duty, constructive trust, and other matters, the final order is silent as to the issues of unjust enrichment or unclean hands. The term "unjust enrichment" is mentioned once in the procedural history, and the term "unclean hands" is never mentioned in the order. The order simply states that the trial court found the request by Lascassas for a total award of $652,617.51 "untenable and inequitable" and an award to A&R for its construction costs "proper and equitable considering the proof."

"In bench trials, trial courts must make findings of fact and conclusions of law to support their rulings." *Hardin v. Hardin*, No. W2012-00273-COA-R3-CV, 2012 WL 6727533, at *3 (Tenn. Ct. App. Dec. 27, 2012). Tennessee Rule of Civil Procedure 52.01 states, in pertinent part, "In all actions tried upon the facts without a jury, the court shall find the facts specially and shall state separately its conclusions of law and direct the entry of the appropriate judgment." "Simply stating the trial court's decision, without more, does not fulfill this mandate." *Barnes v. Barnes*, No. M2011-01824-COA-R3-CV, 2012 WL 5266382, at *8 (Tenn. Ct. App. Oct. 24, 2012). "[T]he General Assembly's decision to require findings of fact and conclusions of law is 'not a mere technicality.'" *Hardin*, 2012 WL 6727533, at *3 (quoting *In re K.H.*, No. W2008-01144-COA-R3-PT, 2009 WL 1362314, at *8 (Tenn. Ct. App. May 15, 2009)). Such "findings and conclusions facilitate appellate review by affording a reviewing court a clear understanding of the basis of a trial court's decision." *Lovlace v. Copley*, 418 S.W.3d 1, 34 (Tenn. 2013). In the absence of sufficient findings and conclusions, "'this court is left to wonder on what basis the court reached its ultimate decision.'" *In re K.H.*, 2009 WL 1362314, at *8 (quoting *In re M.E.W.*, No. M2003-01739-COA-R3-PT, 2004 WL 865840, at *19 (Tenn. Ct. App. Apr. 21, 2004)). There is no bright-line test by which to assess the sufficiency of the trial court's findings, but "the findings of fact must include as much of the subsidiary facts as is necessary to disclose to the reviewing court the steps by which the trial court reached its ultimate conclusion on each factual issue." *Lovlace*, 418 S.W.3d at 35 (quoting 9C *Federal Practice & Procedure* § 2579, at 328).

Without a single finding regarding unjust enrichment or unclean hands in the final order, we are "left to wonder on what basis the court reached its ultimate decision." *See In re K.H.*, 2009 WL 1362314, at *8. "One remedy appellate courts typically apply when a trial court's factual findings fail to satisfy the Rule 52.01 requirement is to remand the case to the trial court with directions to issue sufficient findings and conclusions." *Lovlace*, 418 S.W.3d at 36. We deem it appropriate to remand this matter for the trial court to consider and make appropriate findings regarding the issues of unjust enrichment

17

and unclean hands. The trial court should also consider our conclusions set forth in this opinion regarding breach of fiduciary duty and the propriety of a constructive trust.

### C.   *The Award to Allen for the Balance of the Promissory Note*

The next issue raised by Lascassas is whether the trial court erred in awarding $23,670.57 to Allen, representing the amount he paid for the promissory note, when Allen never asserted a counterclaim seeking such a recovery. The trial court noted in its final order that Allen filed an answer to the complaint "but did not assert any claim for relief." Yet, later in its final order, the trial court found it "proper and equitable considering the proof" to award Allen $23,670.57 from the proceeds held by the clerk, representing the amount he paid to purchase the promissory note held by the bank. On appeal, Allen concedes that he did not request such relief in his pleadings, but he claims the issue was tried by consent.

As support for his trial by consent argument, Allen first points to the fact that the agreed order entered after mediation provided that the sale proceeds would be deposited with the clerk and that the parties reserved the right to litigate "all issues" in this lawsuit regarding the proceeds. Next, Allen notes that the promissory note was "one of the central subjects of questions asked" of him during his deposition and that other witnesses were also asked about the promissory note at trial. Allen claims that the parties thereby impliedly consented to "payment of the Note" being an issue to be resolved at trial. We respectfully disagree.

Throughout the proceedings below and the two-day bench trial, the promissory note was discussed in the sense that Allen's purchase of the promissory note led him to believe that he owned the four lots at issue. The parties also testified that after the note was purchased by Allen, he never contacted Boone or Dempsey to inform them about his purchase of the note or arrange payment terms, and Lascassas did not pay Allen anything toward satisfaction of the note before Allen executed the quitclaim deed. However, Allen never asked the trial court to award him a judgment for the balance of the promissory note, from the sale proceeds or otherwise. During opening statements at trial, Allen's counsel suggested that this was "a pretty simple case" and asked the court to divide the amount of the sale proceeds representing profits from the home sales "equitably and let's go on about our day." During the trial testimony of Boone (the third member of Lascassas in addition to Allen and Dempsey), he was asked whether he intended to begin making payments to Allen for the promissory note after this litigation concluded. Boone responded that he, personally, had never been asked to pay anything toward the note, but that he believed Lascassas would have sufficient funds available to pay the note through the LLC.

18

"When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." Tenn. R. Civ. P. 15.02. When considering the existence of implied consent, we consider "whether the parties recognized that an issue not presented by the pleadings entered the case at trial" or knowingly acquiesced in the introduction of evidence relating to issues beyond the pleadings. *Hiller v. Hailey*, 915 S.W.2d 800, 804 (Tenn. Ct. App. 1995) (quoting *Zack Cheek Builders, Inc. v. McLeod*, 597 S.W.2d 888, 891 (Tenn. 1980)). "Trial of an issue by consent is not shown by presentation of evidence which is relevant to an established issue and also would be relevant to an unexpressed issue." *Id.* at 805 (quoting *Ray v. The Kroger Co.*, No. 83-323-II (Tenn. Ct. App. June 26, 1984)). In other words, trial by implied consent "cannot occur when evidence claimed to be supporting an issue not raised in the pleadings is also relevant to an issue that is actually raised in the pleadings." *In re S.J.M.*, No. M2009-01080-COA-R3-PT, 2009 WL 4039430, at *3 (Tenn. Ct. App. Nov. 20, 2009). For example, in *In re S.J.M.*, the trial court concluded that the only ground for termination of parental rights asserted in the petition was not proven but that another ground for termination, a prison sentence of fifteen years, was established by the evidence. *Id.* This Court reversed, finding the issue was not tried by implied consent. We found that the evidence of incarceration was presented because it was relevant to the issue of abandonment, and no party argued the other ground to the trial court or recognized that it had entered the case at trial. *Id. See also George v. Bldg. Materials Corp. of Am.*, 44 S.W.3d 481, 486 (Tenn. 2001) (explaining that mere introduction of evidence regarding dates did not amount to trial of a statute of limitations defense by implied consent when the evidence was used to establish another issue at trial); *Long v. Long*, No. M2015-00592-COA-R3-CV, 2015 WL 9584393, at *4 (Tenn. Ct. App. Dec. 29, 2015) (vacating an order regarding military retirement pay where the issues before the court were modification of alimony and child support, and although retirement pay was a factor to be considered with respect to those issues, no one asked the court to enter the order on retirement pay and the court "created a claim where none existed").

We conclude that the issue of whether Allen should be awarded a judgment for the amount of the promissory note was not pled or tried by implied consent. The mere introduction of evidence regarding the existence of the note and its nonpayment did not amount to trial by implied consent of whether Allen was entitled to a judgment based on the note. We therefore vacate the portion of the trial court's order awarding Allen $23,670.57 from the proceeds held by the clerk.

### D.    *Punitive Damages*

Finally, we consider the issue raised by Lascassas regarding its entitlement to punitive damages. The trial court dismissed the claim for punitive damages at the close

of the plaintiff's proof based on its conclusion that Allen's conduct was not sufficiently egregious and did not "shock the conscience."

Because punitive damages are intended to punish a defendant, deter the defendant from committing acts of a similar nature, and make a public example of him or her, they are only available in cases involving the most egregious of wrongs. *Sanford v. Waugh & Co.*, 328 S.W.3d 836, 849 (Tenn. 2010). We agree with the trial court's conclusion that Allen's conduct was not intentional, fraudulent, malicious, or reckless "to such an extent as to justify punitive damages," nor did it involve "the most egregious of wrongs." *See id.* The trial court's dismissal of the claim for punitive damages is affirmed.

## V. CONCLUSION

For the aforementioned reasons, the decision of the chancery court is hereby affirmed in part, reversed in part, and remanded for further proceedings. Costs of this appeal are one-half to the appellees, A&R Land Investments, LLC, and Jimmy Allen, and one-half to the appellant, Lascassas Land Company, LLC, and its surety, for which execution may issue if necessary.

_____
BRANDON O. GIBSON, JUDGE

20